Lucas A. Markowitz, Esq.
(*pro hac vice forthcoming*)
Ellen R. Boyd, Esq.
(*pro hac vice forthcoming*)
2020 K Street NW, Suite 760
Washington, DC 20006
Telephone: (202) 886-5260
lmarkowitz@MitchellSandler.com
eboyd@MitchellSandler.com

Austin B. Egan (13203)
**STAVROS LAW P.C.**
8915 South 700 East, Suite 202
Sandy, Utah 84094
Tel: 801.758.7604
austin@stavroslaw.com

*Attorneys for Plaintiffs Brooks Kelly and Jason Harris*

## IN THE UNITED STATES DISTRICT COURT
## THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BROOKS KELLY and JASON HARRIS,<br><br>     Plaintiffs,<br><br>vs.<br><br>DIRECT MORTGAGE CORP. and JAMES (JIM) BEECH,<br><br>     Defendants. | **COMPLAINT**<br><br>**JURY DEMAND**<br><br>Case No. _____<br><br>Judge _____ |

Plaintiffs Brooks Kelly ("Mr. Kelly") and Jason Harris ("Mr. Harris") (together, "Plaintiffs") hereby complain against Defendants Direct Mortgage Corp. ("Direct") and James (Jim) Beech ("Beech") (together, "Defendants"), and allege as follows:

### NATURE OF THE ACTION

1.    This civil action is brought by the above-named Plaintiffs who suffered from Defendants' numerous violations of federal and Texas law. Defendant Beech solicited and induced Plaintiffs to leave their previous employment and enter into an option contract to purchase Direct

under the misimpression that the company's proprietary software would revolutionize the industry, and that Direct was succeeding as a company. In doing so, Beech made specific representations about Direct's proprietary technology platform and the operational infrastructure supporting it; however, after joining Direct, it became apparent to Plaintiffs that the technology platform did not function as represented. In reliance on Defendants' assurances that the system could be salvaged and that the company would not lose any more money, Plaintiffs advanced $200,000 as a personal loan to Direct for the express purpose of being utilized as working capital for the company to meet its financial obligations. However, the technology issues were not resolved, and the funds were never repaid. When it became clear to Defendants that Direct's technology platform had irreparable systemic limitations, Direct instructed Plaintiffs to find a new loan origination software and informed Plaintiffs that Beech needed his money out of the company by January 1, 2026. Plaintiffs were ultimately forced to leave the company altogether as a result of the problematic software that could not be worked through. In addition to these actions, Direct also committed multiple wage and hour violations against Plaintiffs under the Fair Labor Standards Act ("FLSA") and Texas law.

## THE PARTIES

2.      Plaintiff Brooks Kelly is a citizen of the State of Texas with a residential address of 8816 Plano Parkway, Dallas, TX 75238. Defendant Direct employed Mr. Kelly as a Loan Officer during the relevant period.

3.      Plaintiff Jason Harris is a citizen of the State of Texas with a residential address of 12130 Quail Creek Drive, Houston, TX 77070. Defendant Direct employed Mr. Harris as a Strategic Advisor during the relevant period.

2

4.    Defendant Direct Mortgage Corporation is a corporation incorporated in Utah with its principal place of business at 15 West South Temple, Suite 600, Salt Lake City, UT 84101, USA. Plaintiffs are informed and believe and thereon allege that Defendant Direct was authorized to and at all relevant times was doing business in Salt Lake County and is and/or was the legal employer of Plaintiffs.

5.    Defendant Jim Beech, on information and belief, is a citizen of the State of Utah with a residential address at 5 Eaglewood Ln., Sandy, UT 84092.

## JURISDICTION & VENUE

6.    Under 28 U.S.C. § 1331, this Court has original federal question jurisdiction over this action because Counts X and XI, seeking relief under the FLSA, arise under the laws of the United States.

7.    This Court has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Plaintiffs and Defendants are citizens of different states. Specifically, the amount in controversy exceeds at least $750,000, comprising of a $200,000 personal loan, at least $100,00 in unpaid commissions, and unpaid bonuses of at least $450,000.

8.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's remaining state law claims (Counts I-IX), as these state law claims derive from a common nucleus of operative facts with the pending federal FLSA claims.

9.    Venue is proper under 8 U.S.C. § 1391(b)(2) because this is the judicial district in which at least one Defendant resides.

10.    Venue is proper under 8 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## GENERAL FACTUAL ALLEGATIONS

11.     This action arises out of Defendants' fraudulent inducement, concealment, misrepresentations and breaches of Plaintiffs' employment contracts, and consistent practice of knowingly and willfully refusing to pay Plaintiffs proper wages for all hours worked in violation of federal and state law.

12.     On May 7, 2025, Mr. Harris became employed by Direct as a Strategic Advisor. *See* attached as **Exhibit "1"** a true and correct copy of Mr. Harris's Employment Agreement dated May 7, 2025 ("Employment Agreement").

13.     Mr. Harris was brought on to organize, standardize, stabilize, make sustainable, and anything else involved with turning around Direct as a failed company.

14.     On June 6, 2025, Mr. Kelly became employed by Defendant Direct as Director of Retail Sales and MLO. *See* attached as **Exhibit "2"** a true and correct copy of Mr. Kelly's Loan Officer Employment Agreement ("LOEA") dated June 7, 2025.

15.     Mr. Kelly's responsibilities included hiring, managing, originating, and recruiting for Direct.

**Plaintiffs are Induced to Join Direct, and Loan Direct Funds**

16.     Between November 2024 and June 2025, Mr. Kelly and Mr. Harris were personally solicited by Beech, the Chief Executive Officer of Direct, to leave their current employment and to transition a producing team of loan officers to Direct.

17.    At that time, Beech made representations regarding Direct's proprietary technology platform and the operational infrastructure supporting it.

18.    Beech further provoked Plaintiffs to leave their employment and join Direct by offering equity-based upside, including an Option to Purchase Direct Mortgage, and compensation tied to company performance. *See* attached as **Exhibit "3"** a true and correct copy of the Option to Purchase Agreement ("Option Agreement") dated May 1, 2025.

19.    Shortly after joining Direct, it became apparent that the technology platform described by Beech did not function as represented. Rather than delivering the promised efficiencies and compliance safeguards, the system generated inaccurate documents, defective disclosures, and material operational failures that created serious compliance and business risks.

20.    Plaintiffs' decision to join Direct and agree to an option to purchase Direct was made in large part due to the representations Beech had made regarding the functionality and novelty of Direct's proprietary technology.

21.    In reliance on Defendants' assurances that the technology system could be salvaged, and that the company would not lose any more money, Plaintiffs loaned Direct $200,000 for the express purpose of infusing the company with working capital. Defendants agreed that they would pay Plaintiffs back.

22.    Defendants represented to Plaintiffs that the company was short on money despite having previously represented to Plaintiffs that Direct had roughly $3.2 million in working capital.

23.    The $200,000 advance was understood to be a loan by both Defendants and by Plaintiffs.

24.    The $200,000 loan was a personal loan and was unrelated to Plaintiffs' employment with Direct.

25.    Direct received and accepted the $200,000 in funds.

26.    Direct failed to resolve issues with the technology system despite having received funds from Plaintiffs to do so.

27.    Plaintiffs demanded Direct repay the loan.

28.    Direct never repaid the $200,000 loan to Plaintiffs.

29.    By Fall 2025, it was clear that Direct's technology platform was incompatible with effective mortgage operations.

30.    Direct acknowledged the irreparable systemic limitations and told Plaintiffs to abandon the loan operating system, advising Plaintiffs to leave the company altogether.

31.    Immediately thereafter, Direct made plans to sell the company to a third party.

**Direct's Illegal Wage and Hour Scheme**

32.    Direct is an "enterprise engaged in commerce" as defined by the FLSA, as it is a business with at least two employees and an annual gross volume of sales of at least $500,000.

33.    Plaintiffs individually engaged in interstate commerce through loan origination activities, use of interstate instrumentalities, and dealings with out-of-state financial institutions.

34.    Direct was Plaintiffs' "employer" within the meaning of the FLSA and defined by 29 U.S. Code § 203. Direct, as Plaintiffs' employer, willfully failed to pay overtime, warranting a three-year limitations period and liquidated damages.

35.    Defendant Beech, as CEO of Direct, was Plaintiffs' "employer" as defined by 29 U.S. Code § 203(a)(d) ("Employer" includes any person [defined as an individual] acting directly or indirectly in the interest of an employer in relation to an employee").

36.    Direct, as Plaintiffs' employer, willfully failed to pay overtime, warranting a three-year limitations period and liquidated damages.

37.    Mr. Kelly was employed as a Loan Officer, however, he also spent substantial time on internal management, operations, pipeline management, and supervising and managing staff.

38.    Mr. Kelly was promised defined compensation under the LOEA. *See* **Exhibit "2"**.

39.    Specifically, Section 3A of the LOEA states: "Subject to the terms of this Agreement, Employee shall receive commissions calculated by applying the basis points set forth in Exhibit A to the loan amount of any Eligible Loan produced in the applicable month by the Team to which Employee is assigned…." *See Id*.

40.    Section 1 of Exhibit A to the LOEA states that self-sourced loans shall be compensated at 110 bps. *See Id.* at Exhibit A.

41.    Section 3B of the LOEA details that Mr. Kelly was considered to have earned and been entitled to payment of commission on Eligible Loans that were originated and closed under his supervision.

42.    Mr. Kelly worked a minimum of sixteen (16) hours a day, five (5) days a week from Monday to Friday, and also worked at least five (5) hours a day on Saturdays and Sundays. For example, from June 23, 2025, to June 29, 2025, Mr. Kelley worked approximately 90 hours.

43.    Despite having personally closed approximately $10 million in loans, Mr. Kelly did not receive any compensation or commissions in violation of the LOEA.

44.     Mr. Kelly never received any bonuses or bonus compensation of any kind from Direct.

45.     Mr. Harris's daily tasks included underwriting mortgage loans, communicating with loan officers and brokers, insuring government loans, recruiting new production, evaluating technology solutions, and developing P&P for a decentralized remote workforce. Mr. Harris also spent substantial time on internal management operations.

46.     Mr. Harris was promised bonus compensation calculated as a percentage of the increase in Direct's operating profits during his tenure. *See* attached as **Exhibit "4"** a true and correct copy of the May 8, 2025 Offer of Employment Letter ("Offer Letter") from Direct to Mr. Harris.

47.      Mr. Harris' Offer Letter explicitly states that "[b]onus compensation will be defined as 25% of the delta between operating profit earnings before depreciation and amortization, prior to and after employment commences." *See Id*.

48.     During his employment with Direct, Mr. Harris worked at least fourteen (14) to sixteen (16) hours a day, seven (7) days a week. For example, from June 23, 2025, to June 29, 2025, Mr. Harris worked approximately 112 hours.

49.     Mr. Harris never received any compensation, commissions, salary, or bonus compensation during his employment with Direct in violation of his Offer Letter and Employment Agreement, and in violation of Federal and state law.

50.     Defendants lacked any good-faith basis to deny Plaintiffs wages and failed to maintain FLSA-compliant time records.

51.     Plaintiffs are also entitled to profit sharing of Direct's EBIT in the amount of at least $450,000.00, pursuant to the operative agreements.

### FIRST CLAIM FOR RELIEF
(Breach of Employment Contract)
(*By Mr. Kelly against Direct*)

52.     Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

53.     Mr. Kelly entered into the LOEA with Direct.

54.     The LOEA is an enforceable contract

55.     The LOEA provides that, among other things, Mr. Kelly was entitled to commissions on eligible loans.

56.     Mr. Kelly closed approximately $10 million in eligible loans but was never compensated by Direct.

57.     Mr. Kelly has performed all of the obligations required in the LOEA.

58.     Direct breached the LOEA by failing to properly compensate Mr. Kelly as provided for in the LOEA.

59.     As a result, Mr. Kelly has been harmed by Direct's breach in an amount to be determined at trial in this matter.

### SECOND CLAIM FOR RELIEF
(Breach of Employment Contract)
(*By Mr. Harris against Direct*)

60.     Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

61.     Mr. Harris entered into an Employment Agreement with Direct.

62.    The Employment Agreement and terms contained within the Offer Letter are binding and enforceable contracts.

63.    The Offer Letter provides that Mr. Harris would receive bonus compensation at "25% of the delta between operating profit earnings before depreciation and amortization, prior to and after employment commences."

64.    Mr. Harris performed all of his obligations required by the Employment Agreement and Offer Letter.

65.    Direct failed to provide Mr. Harris with any bonus compensation as required under the operative agreements.

66.    As a result, Mr. Harris has been harmed in an amount to be determined at trial in this matter.

### THIRD CLAIM FOR RELIEF
(Fraudulent Inducement)
(*By Plaintiffs against Defendants*)

67.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

68.    Direct, by and through its CEO Beech, induced Plaintiffs to leave their previous employment and join Direct based on material misrepresentations that Direct's proprietary technology platform and operational infrastructure supporting it were fully functional, which Direct and Beech knew to be false.

69.    Specifically, Beech began soliciting Plaintiffs as early as November 2024 and through June 2025, with the intent of inducing Plaintiffs to purchase the company.

70.    Beech made representations to Plaintiffs via email and during in-person conversations between November 2024 and June 2025 regarding Direct's proprietary technology platform's efficiencies and compliance safeguards and regarding Direct's financial status.

71.    Direct and Beech further induced Plaintiffs to leave their previous employment by offering an equity-based upside, including entering into the Option Agreement.

72.    Plaintiffs were induced by equity incentives that would be directly impacted by the successes (or failures) of Direct's proprietary technology, which was represented to Plaintiffs as being functional, efficient and accurate.

73.    Plaintiffs relied upon Defendants' false representations in accepting Direct's employment offers.

74.    Defendants, and specifically Beech, knew the representations he was making regarding the efficiency of Direct's proprietary technology were false at the time he made the statements to Plaintiffs.

75.    Shortly after joining Direct, it became apparent to Plaintiffs that the technology platform described by Defendants and in particular, Beech, did not function as represented, and would need to be replaced.

76.    Moreover, after joining Direct Plaintiffs were informed that Direct was short on working capital, and Plaintiffs were induced to personally lend Direct $200,000 for working capital.

77.    Direct never fixed the system, and never repaid the $200,000 loan to Plaintiffs.

78.    Direct ultimately acknowledged the irreparable systemic limitations and told Plaintiffs that they should leave the company altogether.

11

79.     Defendants' actions have caused Plaintiffs injury.

**FOURTH CLAIM FOR RELIEF**
(Concealment)
(*By Plaintiffs against Defendants*)

80.     Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

81.     Defendants intentionally, knowingly and fraudulently induced Plaintiffs to join Direct.

82.     Defendants knew that Direct's technological systems were flawed, yet concealed that information from Plaintiffs in the hope that Plaintiffs would join the company and bankroll corrections to system technology failures.

83.     Defendants further knew that Direct was short on working capital, despite having made representations and providing accounting regarding Direct's financial status.

84.     Plaintiffs reasonably relied on Defendants' representations, and ultimately loaned Direct $200,000 for working capital. Direct did not fix the system and has failed to pay back Plaintiffs.

**FIFTH CLAIM FOR RELIEF**
(Negligent Misrepresentation)
(*By Plaintiffs against Defendants*)

85.     Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

86.     Defendants carelessly or negligently made statements to Plaintiffs regarding Direct's proprietary technology, supplying false information in the course of business.

87.    For example, in or around November 2024, Beech represented to Plaintiffs that Direct's proprietary technology was unlike anything else in the industry, and specifically that it would lower the unit cost of production to 1/5 of the industry average.

88.    Beech continued making representations regarding Direct's proprietary technology over the course of Plaintiffs' employment.

89.    Plaintiffs relied on Defendants' statements in making employment decisions, namely leaving their current employment for positions with Direct.

90.    Plaintiffs further relied on Defendants' false statements in agreeing to loan Direct $200,000 for working capital.

91.    Defendants failed to exercise reasonable care or competence in obtaining and communicating the information that Plaintiffs justifiably relied upon in making the important employment and financial decisions.

92.    Plaintiffs suffered pecuniary loss due to their justifiable reliance on Defendants' false statements.

## SIXTH CLAIM FOR RELIEF
### (Breach of Contract)
### (*By Plaintiffs against Direct*)

93.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

94.    Plaintiffs and Direct formed an agreement for Plaintiffs to provide Direct a $200,000 loan as working capital.

95.    The $200,000 loan was a personal loan and was unrelated to Plaintiffs' employment with Direct.

96.     Plaintiffs and Direct had a mutual understanding that Direct had an obligation to repay the $200,000 loan.

97.     Plaintiffs performed under the agreement by transmitting the $200,000 loan to Direct.

98.     Direct failed to perform and breached the agreement by failing to use the funds for the specified purpose and further by failing to repay Plaintiffs altogether.

99.     Plaintiffs suffered damages equal to the unpaid principal of the $200,00 loan, plus interest at the maximum rate allowed by law from the date of the advance.

## SEVENTH CLAIM FOR RELIEF
(Unjust Enrichment)
(*By Plaintiffs against Direct*)

100.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

101.    Plaintiffs were induced to lend Direct $200,000 despite the fact that Direct knew or should have known that the technology system could not be salvaged.

102.    Direct has failed to pay back or reimburse Plaintiffs for the $200,000 loan, wrongfully securing the funds for its own benefit.

103.    Direct has consequently benefited from Plaintiffs by way of fraud, duress, or taking of undue advantage of Plaintiffs.

104.    Direct has accordingly been unjustly enriched in an amount of no less than $200,000.

## EIGHTH CLAIM FOR RELIEF
(Promissory Estoppel)
(*By Plaintiffs against Direct*)

14

105.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

106.    Direct's promise to repay Plaintiffs' $200,000 loan was a clear and unambiguous promise.

107.    Plaintiffs relied on Direct's promise and expected Direct to pay back the loan in accordance with its promise to do so.

108.    Plaintiffs relied on Direct's promise to their detriment, when they discovered that the technological issues could not be resolved, and when Direct failed to pay back the $200,000 that was loaned to Direct as working capital.

109.    Plaintiffs have suffered damages by way of Direct's refusal and/or failure to pay back the loan.

110.    Promissory estoppel should be involved to implement justice and to make Plaintiffs whole.

### NINTH CLAIM FOR RELIEF
(Breach of Implied Covenant of Good Faith and Faith and Fair Dealing)
(*By Plaintiffs against Direct*)

111.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

112.    The various agreements and understandings between Plaintiffs and Direct, including those related to the $200,000 loan, contained an implied covenant of good faith and fair dealing, obligating both parties to refrain from acts that would frustrate the purpose of the contracts or deny the other party the benefit of the bargain.

113.     Direct breached this implied covenant by, among other things, misrepresenting the viability of the technology system, failing to disclose material information regarding the system's irreparable defects, inducing Plaintiffs to extend further funds based on these misrepresentations, subsequently failing to repay the loan despite assurances, and failing to pay wages, bonuses and commissions owed.

114.     Direct has accordingly breached its duty of good faith and fair dealing to Plaintiffs.

115.     Direct's conduct as described herein, including its failure to act in good faith regarding the loan repayment and the underlying technology, actively interfered with Plaintiffs' rights to receive the benefits of their agreements and deprived Plaintiffs of their reasonable expectations under those agreements.

116.     Plaintiffs are accordingly entitled to recovery of both actual and punitive damages, as allowed at common law.

## TENTH CLAIM FOR RELIEF
(Failure to Pay Overtime Wages)
(*By Plaintiffs against Defendants*)

117.     Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

118.     Defendant Direct is an "enterprise engaged in commerce" as defined by the FLSA, as it is a business with at least two employees and an annual gross volume of sales of at least $500,000.

119.     Plaintiffs individually engaged in interstate commerce through loan origination activities, use of interstate instrumentalities, and dealings with out-of-state financial institutions.

120.    Direct was Plaintiffs' "employer" within the meaning of the FLSA and defined by 29 U.S. Code § 203. Direct, as Plaintiffs' employer, willfully failed to pay overtime, warranting a three-year limitations period and liquidated damages.

121.    Defendant Beech, as CEO of Direct, was Plaintiffs' "employer" as defined by 29 U.S. Code § 203(a)(d) ("Employer" includes any person [defined as an individual] acting directly or indirectly in the interest of an employer in relation to an employee").

122.    Pursuant to the FLSA, Plaintiffs were entitled to be paid at the overtime rate by Defendants for each hour worked in excess of 40 hours each workweek, computed by multiplying 1.5 times an employee's regular hourly rate, which includes all nondiscretionary compensation paid to employees.

123.    Defendants also failed to compensate Plaintiffs at the overtime rate for work performed in excess of 40 hours per week in violation of the FLSA.

124.    Defendants' violations of the FLSA for failure to pay overtime ages were willful and deliberate because Defendants purposefully failed to track hours or have any policies in place to account for overtime hours and wages.

125.    Defendants violated their duty to accurately and completely compensate Plaintiffs for overtime worked.

126.    During the course of his employment with Direct, Mr. Harris regularly worked in excess of 40 hours per week, entitling him to overtime wages.

127.    Moreover, during various weeks of his employment, Mr. Harris worked 14–16-hour workdays, entitling him to no less than 1.5 times the regular rate of pay for those days.

128.    Similarly, during the course of his employment with Direct, Mr. Kelly regularly worked in excess of 40 hours per week, entitling him to overtime wages.

129.    During various weeks of his employment, Mr. Kelly also worked over 14-hour workdays, entitling him to no less than 1.5 times the regular rate of pay for those days.

130.    As a result of Defendants' faulty policies and practices, Plaintiffs were not compensated for all overtime hours worked.

131.    Due to Defendants' violations of the FLSA, Plaintiffs are entitled to recover unpaid compensation, liquidated damages, reasonable attorneys' fees, and the costs of this action, pursuant to 29 U.S.C. section 216(b).

## ELEVENTH CLAIM FOR RELIEF
(Failure to Pay Minimum Wages)
(*By Plaintiffs against Defendants*)

132.    Plaintiffs re-allege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

133.    Under the FLSA, Plaintiffs were employees entitled to be paid minimum wages.

134.    Direct was Plaintiffs' "employer" within the meaning of the FLSA and defined by 29 U.S. Code § 203. Direct, as Plaintiffs' employer, willfully failed to pay minimum wages, warranting a three-year limitations period and liquidated damages.

135.    Further, the Texas Labor Code Section 62.051 requires that an employer pay to each employee the federal minimum wage under 29 U.S.C. Section 206.

136.    Defendants failed to compensate Plaintiffs per the FLSA minimum wage requirements for the hours worked for Direct.

137.    Defendants failed to pay Plaintiffs for hours worked as Defendants did not pay Plaintiffs based on hours worked, or in fact offer Plaintiffs any compensation whatsoever.

138.    Defendants' failure to pay Plaintiffs for the hours worked resulted in Plaintiffs earning nothing and Plaintiffs were similarly not paid earned commissions. Thus. Plaintiffs' wages fell below minimum wage during each and every week of employment with Direct.

139.    Defendants' violations of the FLSA for failure to pay minimum wages were willful and deliberate, as Direct did not track hours and had no policy for payment of minimum wages.

140.    Due to Defendants violations of the FLSA Texas Labor Code Sections 62.051 and 62.052, Plaintiffs are entitled to recover unpaid compensation, liquidated damages, reasonable attorneys' fees, and the costs of this action, pursuant to 29 U.S.C. § 216(b). Plaintiffs are further entitled to civil penalties pursuant to Texas Labor Code Section 62.201.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues raised by the pleadings so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and against Direct as follows:

A.    Award all actual damages suffered by Plaintiffs;

B.    Order the disgorgement of all monies improperly obtained by Direct;

C.    Enter an order declaring that Direct willfully violated the minimum wage and overtime provisions of the FLSA;

D.    Award Plaintiffs damages in the amount of minimum wages and overtime wages required by the FLSA that were improperly denied by Direct's actions;

E.      Award Plaintiffs liquidated damages equal to Plaintiffs' respective unpaid minimum wages and overtime compensation under the FLSA;

F.      Award Plaintiffs reasonable attorneys' fees under Texas Civil Practice and Remedies Code § 38.001;

G.      All civil penalties afforded by Texas law;

H.      Award Plaintiffs punitive damages;

I.       Award Plaintiffs prejudgment interest;

J.       Award Plaintiffs post-judgment interest;

K.      Award Plaintiffs reasonable attorneys' fees as well as the costs of this action;

L.       Award such other and further relief as this Court deems necessary and proper.

Dated this the 20th day of February, 2026.

**STAVROS LAW P.C.**

/s/ Austin B. Egan
Austin B. Egan

**MITCHELL SANDLER PLLC**

/s/ Lucas A. Markowitz
Lucas A. Markowitz

s/ Ellen R. Boyd
Ellen R. Boyd, Esq.

*Attorneys for Plaintiffs Brooks Kelly and Jason Harris*

# EXHIBIT 1

# Direct Mortgage Corp
## Employment agreement

This Agreement (the "Agreement") is made by and between Direct Mortgage Corp ("The Company") and Jason D. Harris ("Associate") effective as of 05/07/2025

The terms of your compensation and employment are included in your offer letter

In exchange for Associate's continuing employment, and the other promises and covenants set forth herein, the consideration for which receipt and sufficiency are hereby acknowledged, the Parties agree that Associate will be employed by The Company, on the terms and conditions provided for herein.

Notwithstanding anything to the contrary contained herein or elsewhere, the following provisions of this Agreement may only be amended, modified, or waived by a written instrument expressly stating such amendment, modification, or waiver and signed by all parties to this Agreement. No oral agreements, conduct, or course of dealing shall be construed to modify the following seven terms of this Agreement and in the event of any conflict these shall supersede and survive.

1. This Agreement shall be governed by and construed in accordance with the laws of the State of Utah.

2. Associate acknowledges that they will not compete directly or indirectly with Company while employed with The Company while employed.

3. Unless Associate enters into a subsequent written agreement executed by a Control Person The Company alters the at-will relationship in writing, the relationship with the Company is always at-will and not for any fixed term or duration.

4. The Employee agrees not to disclose any confidential or proprietary information of the Employer during or after the term of employment.

5. Associate represents and warrants relevant regulatory and policy knowledge and agrees to comply with all applicable policies and laws related to their duties at The Company

6. Associate, to the best of their ability, shall comply with all policies of The Company outlined in their policies, procedures, and handbooks.

7. Employee will have access to confidential and proprietary information and trade secrets of Employer, all of which are the unique and valuable property of Employer.

   A. Employee acknowledges that, among other things, the company's documents, electronic files, records, customer information, business methods, leads, loan programs, advertising programs, referral sources, marketing strategies, software, investor lists, (the "Confidential Information") will be used solely for Company's benefit and will not be disclosed to any third party without Company's prior express written authorization. Confidential Information does not include materials that Employee possessed prior to employment or that Employee has obtained outside the scope of his employment with DMC.

   B. Employee agrees that following the cessation of employment with Employer s/he will not directly or indirectly solicit, encourage or facilitate any customer who has closed a loan with Company in the preceding six (7) months, to refinance or otherwise prematurely pay-off such loans.

   C. Employee agrees that during his/her employment with Employer Employee will not on behalf of himself or on behalf of any other person, firm, or entity, directly or indirectly solicit any Protected Person to leave the Employer or form or join another entity.   A Protected Person is anyone employed by the company within the 12 months preceding Employee's termination, excluding those persons Employee was primarily responsible for recruiting to join the Company.

   D. Employee agrees that Company shall be entitled to the cost of all legal fees and expenses incurred in investigating and enforcing the covenants contained herein, including fees and expenses incurred prior to filing suit.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

# Direct Mortgage Corp
## Employment agreement

Direct Mortgage Corp

Name: James Beech

Title: CEO

Signature: *James Beech*

Date: 05/08/2025

Associate Name: Jason D. Harris

Signature:

Date: 05/07/2025

# EXHIBIT 2

**DIRECT MORTGAGE CORP.**

**OUTSIDE LOAN OFFICER EMPLOYMENT AGREEMENT**

THIS EMPLOYMENT AGREEMENT, made and entered into this 7th day of June, 2025, is made by and between Direct Mortgage Corp., its successors, assigns and subsidiaries (collectively "Employer" or "Company" or "DMC"), and Brooks Kelly ("Employee" or "Loan Officer") (collectively the "Parties").

**I.     EMPLOYMENT**

This contract is considered at-will, meaning that either Employer or Employee may terminate the employment relationship at any time, for any or no reason, with or without cause or prior notice.

**II.     DUTIES**

A.     Employee agrees to spend a majority of work time each work week away from Company's office or other place of business to perform his/her services, and will not treat his/her home as an office of DMC or customarily conduct any business on a consistent basis from his/her home.  Employee's primary duties shall be to utilize his/her knowledge, training and experience to solicit, originate, and facilitate the processing and closing of loan products and financing of residential real estate transactions on behalf of the Company's customers and originate such loans by meeting clients, referral sources, realtors, and business prospects at their homes and places of employment or in other social settings away from any DMC office.

B.     Employee must know, remain familiar with, and comply with all applicable laws, regulations and industry standards, as well as all company rules, procedures and policies.  Employee must immediately report to the Company any lawsuits, complaints, investigations or other similar actions which involve Employee's duties on behalf of the Company and/or which could potentially affect Employee's licensing status or ability to perform his/her job for the Company.

C.     Employee must be properly licensed in any jurisdictions in which they attempt to originate and/or solicit loan applications. Employee must work exclusively for the Company and may not perform services officially or unofficially for any other company engaged in residential financing while employed by the Company.  Employee understands that s/he has a duty of loyalty to the Company and must work solely in the Company's interests while employed.

D.     Employee may not at any time engage in marketing the Company, use the Company's name or a facsimile of in any marketing, or advertise a product sold by the Company without the Company's prior express permission. Employee may not make any representations as an employee on any social networking, blog or internet site concerning the Company, or its products and/or services without the prior express permission of the Company.

**III.     COMPENSATION**

A.     Subject to the terms of this Agreement, Employee shall receive commission calculated by applying the basis points set forth in Exhibit A to the loan amount of any Eligible Loan produced in the applicable month by the Team to which Employee is assigned (as identified by designation of Team Leader) in accordance with Exhibit A.

B.     Employee is only considered to have earned and be entitled to payment of commission on Eligible Loans. An Eligible Loan is a loan that was originated and closed under Employee's supervision as evidenced by Employee's signature on the final 1003, and which (i) meets all criteria for sale to the investor, (ii) is funded and sold on the secondary market, and (iii) the period for any early payment default or early pay-off has expired. Notwithstanding, the Company may advance the commission on any loan closed under Employee's supervision. In the event such commission is advanced but is later deemed un-earnable as a result of any early payment default or early pay-off, the advanced commission will be subtracted in calculating Employee's next commission payments until it is fully recouped.

C.     Employee agrees that within 30 days of the receipt of any commission checks, s/he will bring to Employer's attention, in writing, any and all objections, disputes, or concerns regarding omissions or errors in connection with commissions paid.  Employee understands that if no such written dispute is initiated, Employee's silence constitutes an acknowledgement that commissions were properly classified and paid.

**IV.     CONFIDENTIAL INFORMATION, TRADE SECRETS, AND NONSOLICITATION**

A.     Employee will have access to confidential and proprietary information and trade secrets of Employer, all of which are the unique and valuable property of Employer.  Employee acknowledges that, among other things, the company's documents, electronic files, records, customer information, business methods, leads, loan programs, advertising programs, referral sources, marketing strategies, software, investor lists, (the "Confidential Information") will be used solely for Company's benefit and will not be disclosed to any third party without Company's prior express written authorization. Confidential Information does not include materials that Employee possessed prior to employment or that Employee has obtained outside the scope of his employment with DMC.

B. Employee agrees that following the cessation of employment with Employer s/he will not directly or indirectly solicit, encourage or facilitate any customer who has closed a loan with Company in the preceding six (6) months, to refinance or otherwise prematurely pay-off such loans.

C. Employee agrees that during his/her employment with Employer Employee will not on behalf of himself or on behalf of any other person, firm, or entity, directly or indirectly solicit any Protected Person to leave the Employer or form or join another entity. A Protected Person is anyone employed by the company within the 12 months preceding Employee's termination, excluding those persons Employee was primarily responsible for recruiting to join the Company.

D. Employee agrees that Company shall be entitled to the cost of all legal fees and expenses incurred in investigating and enforcing the covenants contained herein, including fees and expenses incurred prior to filing suit.

V.    **FORUM SELECTION/JURISDICTION**

In the event that any litigation needs to be brought to obtain temporary injunctive relief and/or enforce or challenge the arbitration provisions herein, or should employee opt out of the arbitration provisions above or assert claims not covered by the arbitration provision, the parties agree that any litigation between the parties may only be brought in Federal District Court in Utah, or in the event subject-matter jurisdiction is lacking, in an Utah State Court of competent jurisdiction. By execution of this Agreement, the parties are consenting to personal jurisdiction in Utah limited to such matters.

VI.    **ARBITRATION/GOVERNING LAW/CONSENT TO JURISDICTION**

This Agreement is made and entered into in the State of Utah and governed by the law of the State of Utah. In the event of any Covered Dispute, it shall be resolved through binding arbitration in accordance with the rules of JAMS Arbitration, provided however, that notwithstanding any rules in JAMS to the contrary, employees' claims may not be joined with the claims of any other person or Employee and there will be no allowance for Employee to pursue or participate in relief on a class or collective action basis against the Company arising out of the employment relationship or this agreement. A Covered Dispute means any dispute arising out of this agreement and/or the employment relationship between the parties, excluding only those claims relating to the enforceability or violation of any Restrictive Covenants as set forth in Section IV herein. Notwithstanding any JAMS rule to the contrary, the parties will share equally in the cost of such Arbitration, and shall be responsible for their own attorneys' fees, provided that if the Arbitration is brought pursuant to any statutory claim for which attorneys' fees were expressly recoverable, the Arbitrator shall award such attorneys' fees and costs consistent with the statute at is sue. Moreover, if the claim is de minimus in comparison with the amount of the arbitration fee, Employer may, in its discretion, agree to pay Employees share of the Arbitration Fee. Further, notwithstanding any JAMS' rules to the contrary, the Parties exclusively preserve the determination of whether a matter is Covered Dispute and therefore arbitrable, to the sole determination of a court of competent jurisdiction. Nothing herein shall preclude a party from seeking temporary injunctive relief in a court of competent jurisdiction to prevent irreparable harm, pending any ruling obtained through Arbitration. Further, nothing herein shall preclude or limit Employee from filing any complaint or charge with a State, Federal, or County agency. Employee has the right to opt out of this portion of the Agreement since acceptance of this term means that Employee is waiving the right to have a Covered Dispute decided in court and/or by a jury. To opt out of this provision, thus relieving both parties of its obligations, Employee must either (1) send a notarized letter to the attention of Employee's immediate supervisor copied to the Company's Human Resources department, both sent via Certified Mail within 30 days of the execution of this Agreement expressly opting out of this provision; or (2) strike the entirety of this paragraph and initialing here as follows:

VII.    **MISCELLANEOUS**

This Agreement sets forth the entire understanding and agreement of the parties hereto and fully supersedes any and all prior or contemporaneous agreements or understandings between the parties. This Agreement may not be modified except in writing between all parties hereto. No oral promises, assurances, agreements, or understandings either prior or subsequent to the execution of this Agreement are binding or may be relied upon.

IN WITNESS WHEREOF and intending to be legally bound hereby, the parties have read, understood and executed this Agreement the day and year above written.

| *Brooks Kelly* | |
| --- | --- |
| Loan Officer | Direct Mortgage Corporation |

| 06/19/2025 | |
| --- | --- |
| Date | Date |

NMLS ID#  208792

2

Initials  BK

Exhibit A: Compensation Addendum

1. **Compensation on Self-Sourced Loans: 110 bps.** As used in this Exhibit, "Self-Sourced Loans" refers to loans that the Employee obtains through their own relationships, business sources or marketing, provided however that any Corporate Program does not qualify as a Self Sourced Loan and shall be compensated at 65 bps

2. **Corporate Programs** include (i) loans that are brokered when there is no possible alternative financing that can be offered to a borrower except for a brokered product; (ii) loans that are not saleable on the secondary market and are offered as an exception to a borrower because no other possible financing is available through the Company; (iii) loans being refinanced by existing borrowers; and (iv) loans being offered to customers who only qualify for a DPA or Bond loan and cannot obtain any other type of financing

3. **Second position Mortgages: The Company does not compensate piggy back second mortgages except for Company branded HELOC/ HELOAN mortgages, which are compensated at 65 bps.**

4. **Company Sourced (non-Broker Funded) Loans.** Company Sourced Loans shall include loans from a specific source or relationship established by the Company, wherein the Company devotes an investment of financial and/or Employee resources to the maintenance of that source ("Company Source"). The Employee shall be eligible to earn a reduced commission rate of 65 bps on all Company Sourced Loans regardless of loan amount, pricing, program or product.

5. **Maximum Commission.** Notwithstanding the foregoing and regardless of the Employee's base commission rate or Tier Commission earned, the maximum commission on any individual loan is $8,800 except that the maximum commission on any bond or housing finance agency loan offered to a borrower that does not qualify for any other program is **$5,250 .**

6. **Loan Referrals.** If You or your branch are not licensed in a state for which You have a potential referral, the Company has established a policy and procedure for Loan Referrals and Out-of-State Lending. The corporate office will upon request assign a loan officer to the file and will refer that loan to the loan officer. You may contact the loan officer and transition the file, and follow up from time to time with the borrower to make sure they are satisfied. However, you may not in any respect engage in any licensed activity or otherwise work on the loan. Provided you adhere to the policy, you will be paid 50% of the commission otherwise payable on the loan in states where permitted. **If you receive a referred loans**, your commission shall be equal to 50% percent of the commission otherwise payable on the loan.

_Brooks Kelly_

_____
Loan Officer

_____
Direct Mortgage Corporation


06/19/2025
_____
Date

_____
Date

NMLS ID#__208792__

Initials 

# EXHIBIT 3

**OPTION TO PURCHASE AGREEMENT**

This OPTION TO PURCHASE AGREEMENT (this "**Agreement**"), dated effective as of May 1, 2025 (the "**Effective Date**"), is entered into by and between Proxima Holdings, LLC or its designees ("**Proxima**"), Beech Enterprises, L.L.C. (the "**Seller**"), and, for the limited purposes set forth herein, James Beech ("**Beech**") (each of the foregoing, a "**Party**" and, collectively, the "**Parties**").

WHEREAS, the Seller owns all of the issued and outstanding capital stock of Direct Mortgage, Corp. ("**Direct**"); and

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Proxima may exercise its option to purchase from Seller, and Seller thereafter shall sell to Proxima, all of the issued and outstanding capital stock of Direct (the "**Purchased Interests**").

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, conditions, and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**OPTION**

Beginning on the Effective Date, Proxima shall have the option (the "**Option**") to purchase from the Seller the Purchased Interests on the terms and subject to the conditions set forth in this Agreement. Proxima shall have the right to exercise the Option at any time through and including the earlier of the Termination Date or the first anniversary of the Effective Date; <u>provided</u>, however, that, Proxima shall have the right to extend its right to exercise the Option through and including the second anniversary of the Effective Date by notifying Seller of its intent to extend the Option, at which time the Purchase Price shall increase by ten percent (10%) to Two Million Four Hundred Twenty Thousand Dollars ($2,420,000). The Option shall expire if not exercised during the time frames specified in the immediately preceding sentence. Upon exercise of the Option, Seller shall sell to Proxima the Purchased Interests on the terms and subject to the conditions set forth in this Agreement.

**ARTICLE I**
**DEFINITIONS**

**Section 1.1**    Definitions. The following terms, whenever used in this Agreement, shall have the following meanings for all purposes of this Agreement.

"**Action**" means any action, suit, dispute, claim, charge, complaint, examination, petition, arbitration, mediation, investigation, hearing, litigation, audit, or other proceeding (whether civil, criminal, administrative, judicial, investigative, or otherwise, in law or in equity) by or before any Governmental Entity.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first Person. For purposes of this definition, "control" of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether by ownership of voting stock, Contract, or otherwise.

"**Agency**" means any of Fannie Mae, FHA, VA, USDA, Freddie Mac, GNMA, and HUD.

"**Business**" means the business of Direct as currently conducted or as imminently anticipated to be conducted as of the Effective Date.

"**Business Day**" means any day other than: (i) a Saturday or Sunday; (ii) a legal holiday in the State of Utah; or (iii) other day on which banking institutions in the State of Utah are authorized or required by Law or executive order to close.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidential Information**" means any information of Direct's that is confidential or proprietary or that Direct treats as proprietary or that Direct does not in the Ordinary Course disclose to any Person outside of Direct concerning: (a) Direct, including any and all Direct Owned Intellectual Property, know-how, research and development information, plans, proposals, technical data, copyright works, financial, trade secrets, marketing and business data, customer lists, pricing and cost information, business and marketing plans, and customer and supplier lists; and (b) the terms of this Agreement. Notwithstanding the foregoing, Confidential Information shall not include information that: (i) is or becomes generally available to the public other than as a result of disclosure by Seller in breach of this Agreement; (ii) is independently developed without use of or reference to any Confidential Information; (iii) is rightfully obtained by Seller from a third party who has the right to transfer or disclose it; or (iv) is required to be disclosed by law, regulation, or court order.

"**Contract**" means any legally binding contract, agreement, arrangement, promise, lease, note, bond, Mortgage, license, indenture, or similar commitment.

"**Direct Owned Intellectual Property**" means any and all Intellectual Property owned by Direct.

"**Employment Agreements**" means each employment agreement by and between Direct and Jason Harris and Brooks Kelly.

"**Employee Benefit Plan**" means any: (i) "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) whether or not subject to ERISA; and (ii) any and any other compensation or benefit plan, program, policy, contract, understanding, or arrangement of any kind, whether written or oral, including any pension, retirement, profit-sharing, thrift, tax gross-up, deferred compensation, severance, termination, employment (including offer letters), consulting, change in control, retention, incentive, equity or equity-based compensation, performance, bonus, vacation, paid time off (PTO) or holiday pay, sick pay, sick leave, hospitalization or other medical, disability, vision, life, accident or other insurance, fringe-benefit, or other welfare, retiree welfare, or benefit plan to which Direct or any of its ERISA Affiliates, sponsors, maintains, contributes to, is a party to, by which it is bound, or pursuant to which it may be required to make any payment at any time for the benefit of any current or former employee, officer, director, consultant, or advisor of Direct (or their respective beneficiaries) or with respect to which Direct or its ERISA Affiliates have or may have any Liability.

"**Encumbrances**" means any lien, claim, hypothecation, mortgage, security interest, equitable interest, pledge, license, charge, judgment, attachment, easement, conditional sale or other title retention agreement, deed of trust, right of first refusal, right of first offer, right-of-way, including utility rights-of-way, variance, or restrictions on transfer, or other lien of any nature whatsoever, whether consensual, statutory, inchoate, or otherwise.

"**Equity Rights**" means, with respect to any Person, securities or obligations convertible into, exercisable, or exchangeable for, or giving any Person any right to subscribe for, redeem, or acquire, any option, warrant, call, put, or commitment relating to, or any equity appreciation right, phantom equity, or

other instrument the value of which is determined, in whole or in part, by reference to the market price or value of any Equity Interest of such Person.

"**Equity Interest**" means, with respect to any Person: (a) any common, preferred, other capital stock, limited liability company interest, membership interest, or similar security of that Person; and (b) any warrant, option, or other right to, directly or indirectly, subscribe for, purchase, or acquire any interest described in clause (a).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" of Direct means any other entity that, together with Direct, would be treated as a single employer under Sections 414(b), (c), (m), or (o) of the Code.

"**Fannie Mae**" means Federal National Mortgage Association or any successor to it.

"**FHA**" means the United States Federal Housing Administration.

"**Freddie Mac**" means Federal Home Loan Mortgage Corporation or any successor to it.

"**GAAP**" means United States generally accepted accounting principles consistently applied.

"**GNMA**" means Government National Mortgage Association, aka Gennie Mae, or any successor to it.

"**Governing Documents**" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or that govern(s) its internal affairs. For example, the Governing Documents of a corporation are its certificate of incorporation and bylaws, the Governing Documents of a limited partnership are its limited partnership agreement and certificate of limited partnership, and the Governing Documents of a limited liability company are its operating agreement and certificate of formation.

"**Governmental Entity**" means any federal, foreign, state, county, municipal, provincial, or local governmental authority, court, judicial body, government or self-regulatory organization, commission, tribunal, or organization, or any regulatory, administrative, or other agency, or any political or other subdivision, department, commission, board, bureau, branch, division, ministry, or instrumentality of any of the foregoing.

"**HUD**" means the United States Department of Housing and Urban Development.

"**Indebtedness**" means, without duplication: (a) indebtedness of Direct that is issued or incurred for borrowed money; (b) any indebtedness of Direct evidenced by any note, bond, debenture, mortgage, or other debt instrument or debt security, including the outstanding principal amount, accrued and unpaid interest related to that instrument, and any related fee, expense, or other payment obligation (including any prepayment penalty, premium, cost, breakage, or other amount payable as a result of the consummation of the Transactions); (c) any obligation of Direct under any drawn letter of credit, bankers' acceptance, or similar obligation; (d) obligations with respect to leases required to be accounted for as capital leases under GAAP; (e) obligations for the deferred purchase price of property, assets, or services, including "purchase price adjustments," "earn-outs," and "seller notes" (but excluding any trade payable or accrued expense arising in the Ordinary Course); (f) all reimbursement and other obligations with respect to letters of credit, bank guarantees, bankers' acceptances, performance bonds, or other similar instruments, solely to the extent drawn; (g) all obligations (including any cost or fee) with respect to any interest rate, currency swap, cap,

forward, or other similar arrangements designed to provide protection against fluctuations in any price or rate; (h) all obligations under sale-and-leaseback transactions: (i) the aggregate amount of any declared but unpaid distributions or dividends to equity holders; (j) unpaid Liabilities of Direct for Taxes then due and payable; (k) guarantees by Direct (to the extent of the amount of such guarantees) of any obligation of the type described in the foregoing clauses (a) through (j); and (l) all obligations of the type described in the foregoing clauses (a) through (j) that are secured by any Lien on any property or asset of Direct (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured. Notwithstanding the foregoing, the term Indebtedness shall not include: (i) any deferred revenue, deferred rent, or non-capitalized leases; (ii) any indebtedness arranged by Proxima or any of its Affiliates; (iii) any letter of credit, surety bond, performance bond, bankers' acceptance, or similar obligation to the extent undrawn or for which a funding claim has not been made that is pending; or (iv) any amounts included as Transaction Expenses.

"**Intellectual Property**" means any and all intellectual property assets and rights and all worldwide rights in, arising from, or associated with any of the foregoing, whether protected, created, or arising under the laws of the United States or any other jurisdiction or under any international convention, including: (a) trade names, trade dress, logos, packaging design, slogans, registered and unregistered trademarks and service marks and applications for registration, and all goodwill associated with the foregoing ("**Trademarks**"); (b) internet domain name registrations ("**Domain Names**"); (c) copyrights in both published and unpublished works of authorship, including all compilations, databases, computer programs (source code and object code versions), copyright registrations and applications, and all derivatives, translations, adaptations, and combinations of the foregoing ("**Copyrights**"); (d) social media accounts and social media handles; and (e) trade secrets, confidential information, and other proprietary information which derives independent economic value from not being generally known to the public.

"**IRS**" means the United States Internal Revenue Service.

"**Law**" means any statute, treaty, law (including common law), ordinance, code, rule, regulation, Order, or other legal requirement of any Governmental Entity.

"**Leased Real Property**" means any real property leased, subleased, licensed, or otherwise occupied by Direct.

"**Liability**" means any debt, liability, loss, cost, expense, commitment, or obligation, whether known or unknown, secured or unsecured, accrued or fixed, matured or unmatured, liquidated or unliquidated, due or to become due, absolute, contingent, or otherwise.

"**Loss Determination**" has the meaning set forth in Section 9.16 of this Agreement

"**Loss**" or "**Losses**" means any fee, judgment, offset, interest, award, penalty, settlement, disgorgement, Tax, Liability, loss, damage, assessment, judgment, cost, or expense actually incurred or suffered by any Indemnified Party, including reasonable attorneys' fees; provided that Losses shall not include any consequential, indirect, special, punitive, or exemplary damages unless such damages are actually paid to a third party.

"**Material Adverse Effect**" means any event, occurrence, fact, condition, or change that is materially adverse to: (a) the Business, results of operations, financial condition, or assets of Direct, taken as a whole; or (b) the ability of Direct or the Seller to consummate the Transactions; provided that, in each case, excluding such effects reasonably attributable to (i) (A) economic conditions generally in the United States, conditions in the financial or securities markets in general or conditions in general in the industries

4

or markets in which the Business operates; (B) changes in Laws of general applicability or interpretations thereof by courts or Governmental Entities; (C) changes in GAAP; or (D) changes in global or national political conditions, including the outbreak or escalation of war, acts of terrorism or natural disasters, to the extent that such conditions or changes listed in items (A) through (D) do not disproportionately adversely affect the Business relative to other participants in the industries and geographic locations in which the Businesses participate; (ii) the announcement of this Agreement, or the consummation of the transactions contemplated by this Agreement, including the impact thereof on relationships, contractual or otherwise, with customers, suppliers, licensors, distributors, partners, providers or employees; (iii) any failure to meet projected financial performance for any period (provided that the underlying causes of such failure may be considered in determining whether there has been, or is reasonably likely to be, a Material Adverse Effect); or (iv) any action taken by (or at the request of) Proxima.

"**Mortgage**" means the mortgage, mortgage deed, deed of trust, or other instrument creating a lien on real property securing the Mortgage Note and related to a Mortgage Loan; provided, however, that, with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is an accepted practice, the mortgage, deed of trust, or other instrument securing the Mortgage Note may secure and create a lien on a leasehold estate of the Mortgagor, including any rider, addendum, assumption agreement, or modification relating to such instrument.

"**Mortgage Loan**" means a mortgage loan that is owned, sold, originated, insured, fulfilled, closed, or purchased by Direct.

"**Mortgage Note**" means, with respect to any Mortgage Loan, the note or other evidence of indebtedness of the Mortgagor under such loan, including, if applicable, allonges and lost note affidavits.

"**Order**" means any order, writ, injunction, judgment, ruling, assessment, arbitration award, plan, or decree entered, issued, made, approved, or rendered by any Governmental Entity.

"**Ordinary Course**" means, when used in reference to any Person, the ordinary and normal course of business of such Person consistent in all material respects with past customs and practices of such Person.

"**Permit**" means each permit, certificate, license, consent, approval, or authorization issued, granted, given, or made available by or under the authority of any Governmental Entity.

"**Permitted Encumbrances**" means: (a) Encumbrances for Taxes or other charges of any Taxing Authority not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings by Direct, and in each case, for which there are adequate accruals in accordance with GAAP; (b) landlords', mechanics', carriers', workers', repairers', and similar Encumbrances arising or incurred in the Ordinary Course not yet due and payable; and (c) Encumbrances, easements, servitudes, and other restrictions on real property (including covenants, restrictions, rights-of-way, easements, and other similar matters) affecting real property (including the Leased Real Property).

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, trust, association, organization, Governmental Entity, or other entity.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the portion of any Straddle Tax Period through and including the Closing Date.

"**Representatives**" means, with respect to any Person, its employees, officers, independent contractors, directors, investment bankers, attorneys, accountants, and agents.

Docusign Envelope ID: 0FFC4738-6F6F-4B4D-A9B0-E36497B48DD9

"**Straddle Tax Period**" means any taxable period that begins on or before the Closing Date and ends after the Closing Date.

"**Tax**" or "**Taxes**" (and with correlative meaning, "**Taxable**" and "**Taxing**") means any: (i) foreign, federal, state, county, or local impositions, duties, contributions, charges, and levies (including income, alternative minimum, sales, use, ad valorem, value added, excise, franchise, real and personal property, gross receipt, capital gains, employment, social security, payroll, severance, or withholding tax), transfer tax, and other tax or charge of the same or of a similar nature to any of the foregoing imposed by any Taxing Authority (including any interest, fine, assessment, penalty (civil or criminal), addition to tax related to such interest, fine, assessment, or penalty (whether disputed or not), and additions related to the non-payment of such interest, fine, assessment, or penalty, whether disputed or not); (ii) Liability for the payment of any amount of the type described in the foregoing clause (i) as the result of being a member of an affiliated, consolidated, combined, unitary, or aggregate group for any taxable period; and (iii) Liability for the payment of any amount of the type described in the foregoing clauses (i) or (ii) as a result of being a transferee of or successor to any Person or as a result of any express or implied obligation to assume such amount or to indemnify any other Person with respect to such amount.

"**Tax Proceeding**" means any Action by or against any Taxing Authority.

"**Tax Return**" means any return, declaration, report, estimate, claim for refund, information return, or statement (including any related or supporting estimate, election, statement, or information) relating to (or required to be filed in connection with) any Taxes (including any schedule, form, attachment, or amendment).

"**Taxing Authority**" means any Governmental Entity exercising any authority with respect to any Tax.

"**Termination Date**" has the meaning set forth in <u>Section 9.16</u> of this Agreement.

"**Transaction Expenses**" means, without duplication, solely to the extent not paid before the Closing, all out-of-pocket fees, costs, and expenses incurred by or on behalf of Direct or the Seller as a result of the Transactions, including: (a) the fees and expenses payable by Direct or the Seller to any attorney engaged by Direct or the Seller in connection with this Agreement and the Transactions; (b) the fees and expenses payable by Direct to any financial advisor, investment bankers, brokers, accountants, or other advisors engaged by Direct or the Seller and incurred in connection with this Agreement and the Transactions; (c) the fees and expenses payable by Direct to any of its Affiliates, including in connection with the settlement of any intercompany receivable (all of which shall be fully settled in cash before the Closing in accordance with <u>Section 6.2</u>); (d) any benefit, deferred compensation, incentive compensation, severance payment, sale bonus, retention payment, and any other change of control or similar obligation, synthetic equity payment, or parachute payment, due and payable to the applicable recipient pursuant to an agreement entered into by Direct before the Closing, to consultants, contractors, directors, officers, or employees (whether current or former) of Direct or any of its Affiliates as a result of the consummation of the Transactions (and not otherwise included within Indebtedness); (e) the employer's share of any employment Taxes to be paid in connection with the payments contemplated by clause (d) of this definition and the employer portion of any Employee Benefit Plan contributions attributable to such payments; and (f) severance payments to former employees who were terminated before the Closing.

"**Transactions**" means the exercise by Proxima of the Option, the sale and purchase of the Purchased Interests, and the other matters related to the transactions contemplated by this Agreement.

"**Transfer Taxes**" means all transfer, documentary, sales, use, stock, filing, permit, license, stamp, registration, value added, recording, and other similar taxes and fees (including with all recording expenses and notarial fees) attributable to, imposed on, or arising from or in connection with the consummation of the Transactions.

"**USDA**" means the United States Department of Agriculture and any successor to it.

"**VA**" means the United States Department of Veterans Affairs and any successor to it.

**Section 1.2**     Interpretive Provisions. Unless the express context otherwise requires: (a) terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (b) the terms "Dollars" and "$" mean United States Dollars; (c) references to a specific Section (except when such reference is to a specific Section of a Law), Subsection, or Exhibit refer, respectively, to Sections, Subsections, or Exhibits of this Agreement; (d) wherever the word "include," "includes," or "including" is used, it shall be deemed to be followed by the words "without limitation"; (e) references to any gender shall be deemed to include each other gender; (f) references to any Person shall include such Person's heirs, executors, personal representatives, administrators, beneficiaries, successors, and assigns; provided, however, that nothing contained in this clause (f) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (g) references to any Contract (including this Agreement) mean such Contract as amended, supplemented, or modified, in accordance with the terms of that Contract, and include all schedules, exhibits, annexes, and other attachments to that Contract; (h) the term "or" means "and/or"; (i) with respect to the determination of any period of time, the word "from" means "from and including" and each of the words "to" and "until" means "to but excluding"; (j) references to any Law or any license mean such Law or license as amended, modified, codified, reenacted, supplemented, or superseded, in whole or in part; and (k) references to any Law shall be deemed also to refer to all rules and regulations promulgated under such Law.

**ARTICLE II**
**PURCHASE AND SALE**

**Section 2.1**     Sale of the Purchased Interests.  At the Closing, on the terms and subject to the conditions in this Agreement, the Seller shall sell, transfer, convey, assign, and deliver to Proxima, and Proxima will purchase, acquire, and accept from the Seller, the Purchased Interests, free and clear of all Encumbrances (other than Permitted Encumbrances), for a purchase price of Two Million Two Hundred Thousand Dollars ($2,200,000.00) (the "**Purchase Price**").

**Section 2.2**     Withholding.  Proxima, Direct, the Seller, and any of their applicable agents shall each be entitled to deduct and withhold from any amount payable pursuant to this Agreement such amounts as are required to be deducted or withheld under the Code or any provision of state, local, or foreign Tax law, provided that (i) the withholding party provides at least fifteen (15) days' advance written notice to the party subject to withholding, including documentation of the legal basis and calculation of such withholding, (ii) the parties shall cooperate in good faith to minimize any such withholding, and (iii) no withholding shall be made if the party subject to withholding provides appropriate certificates or documentation establishing an exemption from withholding. To the extent such amounts are so deducted or withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid.

## ARTICLE III
## THE CLOSING

**Section 3.1**    Closing.  The closing of the Transactions (the "**Closing**") shall, subject to the satisfaction or waiver of the conditions set forth in ARTICLE VII, be conducted remotely by delivery of the applicable deliveries contemplated by this Agreement to be delivered at Closing and shall occur on the second Business Day following the satisfaction or waiver of all of the conditions set forth in ARTICLE VII (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date is agreed to in writing by the Parties. The date on which the Closing is to occur is hereinafter referred to as the "**Closing Date**."

**Section 3.2**    Payments to be Made at the Closing. At the Closing:

(a)    Proxima shall pay one hundred thousand dollars ($100,000) of the Purchase Price to the Broker used by Proxima in connection with the Transactions ("**Broker**") by wire transfer of immediately available funds to the account of Broker as Broker shall designate in writing to Proxima;

(b)    Proxima shall deduct from, and pay to the payee thereof from, the remaining portion of the Purchase Price after the payment identified in Section 3.2(a) above, all Transaction Expenses and Indebtedness that have not yet been paid by the Seller as of Closing, provided that if any Transaction Expenses or Indebtedness continues to remain unpaid, such amounts shall be the obligation and responsibility of Beech and Seller; and

(c)    Proxima shall pay the balance of the Purchase Price, if any, to the Seller by wire transfer of immediately available funds to the Seller's account(s) as the Seller shall designate in writing to Proxima.

**Section 3.3**    Transactions to be Effected at the Closing. At the Closing:

(a)    The Seller shall deliver, or cause to be delivered, to Proxima all of the following:

(i)    to the extent that they exist, stock certificates evidencing the Purchased Interests, free and clear of all Encumbrances (other than Permitted Encumbrances), accompanied by stock interest powers or other instruments of transfer, duly executed by the Seller;

(ii)    an IRS Form W-9, duly executed by the Seller;

(iii)    a certificate duly executed by an authorized officer of Direct, dated as of the Closing Date, certifying as to: (A) the Governing Documents of Direct in effect as of the Closing Date; (B) a certificate of good standing of Direct, issued as of a recent date by the Secretary of State of its state of incorporation; and (C) the unanimous written consent duly approved and adopted by the shareholders and board of directors of Direct authorizing: (1) the execution and delivery of this Agreement by Direct; (2) the performance by Direct of its obligations under this Agreement; and (3) the consummation of the Transactions;

(iv)    resignation letters of those officers and directors of Direct identified by Proxima prior to Closing, duly executed by each of such officers and directors of Direct;

(v)    evidence of all necessary Consents and Filings in a form reasonably satisfactory to Proxima.

(b)    Proxima shall deliver, or cause to be delivered, to the Seller each of the payments described in Section 3.2.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Seller hereby represents and warrants to Proxima that the statements contained in this ARTICLE IV are true and correct as of the date of this Agreement and as of the Closing Date:

**Section 4.1**    Organization and Qualification. Direct is a corporation duly organized, validly existing, and in good standing under the laws of the state of its incorporation. Direct has all requisite corporate or other organizational power and authority to own, lease, and operate its properties and assets and to carry on its business as presently conducted and is duly qualified and in good standing to do business as a foreign entity in each jurisdiction in which it is qualified to do business, except where such failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

**Section 4.2**    Authorization and Legal Capacity. Each of the Seller and Direct has all requisite corporate power and authority, and has taken all action necessary, to authorize, execute, deliver, and perform this Agreement and to consummate the Transactions in accordance with the terms of this Agreement. This Agreement has been duly and validly executed and delivered by the Seller or Direct and (assuming the due authorization, execution, and delivery of this Agreement by the other parties to this Agreement) constitutes a valid, legal, and binding agreement of the Seller or Direct, enforceable against Seller or Direct in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and similar Laws of general applicability relating to or affecting creditors' rights and subject to general equity principles (the "**Bankruptcy and Equity Exception**").

**Section 4.3**    Ownership of Direct. The Seller owns all the issued and outstanding capital stock in Direct, and there is no other Equity Interest (other than this Agreement) in Direct that is issued, reserved for issuance, or outstanding.

**Section 4.4**    Title to the Purchased Interests. The Seller has good and valid title to the Purchased Interests, free and clear of all Encumbrances (other than Permitted Encumbrances), and the Purchased Interests are not subject to or in violation of any preemptive right, right of first refusal, right of first offer, or similar right of any Person, and the delivery to Proxima of the Purchased Interests under the terms of this Agreement will transfer to Proxima good and valid title to the Purchased Interests. Other than pursuant to this Agreement, the Purchased Interests are not subject to (and have not been issued in violation of) any purchase option, call, right of first refusal or offer, preemptive, subscription, or similar rights under any provision of Law, the Governing Documents of Direct, or any Contract by which the Seller or Direct is bound.

**Section 4.5**    Consents. No consent, approval, license, Permit, Order, or authorization (each, a "**Consent**") of (or registration, declaration, notice, or filing (each, a "**Filing**") with) any Governmental Entity or Agency is required for or in connection with the execution and delivery of this Agreement by the Seller or Direct or the consummation of the Transactions, excepts for any relevant Consents or Filings required by Fannie Mae, Freddie Mac, or GNMA (the "**Required Regulatory Consents and Filings**").

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PROXIMA

Proxima hereby represents and warrants to the Seller that the statements contained in this ARTICLE V are true and correct as of the date of this Agreement and as of the Closing Date:

**Section 5.1**     <u>Organization and Standing</u>. Proxima is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of its incorporation, has all requisite corporate or other organizational power and authority to own, lease, and operate its properties and assets and to carry on its business as presently conducted, and is duly qualified and in good standing to do business in each jurisdiction in which the conduct or nature of its business or the ownership, leasing, or holding of its properties makes such qualification of good standing necessary, except where such failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

**Section 5.2**     <u>Authorization and Legal Capacity</u>. The execution, delivery, and performance by Proxima of this Agreement and the consummation by Proxima of the Transactions are within the power and authority of Proxima and have been duly and validly authorized by all necessary action on the part of Proxima. No other proceeding on the part of Proxima is necessary to authorize this Agreement or to consummate the Transactions. This Agreement has been duly and validly authorized, executed, and delivered and (assuming the due execution and delivery by each of the other parties to this Agreement) constitutes a legal, valid, and binding obligation of Proxima, enforceable against Proxima in accordance with its terms, subject in all cases to the Bankruptcy and Equity Exception.

**Section 5.3**     <u>Consents</u>.  No Consent of, or Filing with, any Governmental Entity or Agency is required for or in connection with the execution and delivery of this Agreement by Proxima or the consummation by Proxima of the Transactions, except for the Required Regulatory Consents and Filings, and except for any such Consent or Filing for which the failure of Proxima to make or obtain would not, individually or in the aggregate, result in material Liability to Direct or the Seller.

**Section 5.4**     <u>Sufficiency of Funds</u>. Proxima has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the Transactions.

**Section 5.5**     <u>"As Is, Where Is" Purchase</u>. PROXIMA ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN <u>ARTICLE IV</u> OF THIS AGREEMENT, (A) THE PURCHASED INTERESTS AND ANY ASSETS OF DIRECT ARE BEING ACQUIRED "AS IS, WHERE IS" AND WITH ALL FAULTS, LIMITATIONS, AND DEFECTS (HIDDEN AND APPARENT) AND (B) NEITHER THE SELLER NOR ANY OF ITS OFFICERS, DIRECTORS, REPRESENTATIVES, OR EMPLOYEES MAKES OR HAS MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE PURCHASED INTERESTS OR ANY ASSETS OF DIRECT. PROXIMA ACKNOWLEDGES THAT IT HAS CONDUCTED TO ITS SATISFACTION AN INDEPENDENT INVESTIGATION, VERIFICATION, ANALYSIS, AND EVALUATION OF THE PURCHASED INTERESTS AND THE FINANCIAL CONDITION, OPERATIONS, ASSETS, LIABILITIES AND PROPERTIES OF DIRECT.

### ARTICLE VI
### COVENANTS

**Section 6.1**     <u>Taxes</u>.

(a)     <u>Agreed Tax Treatment</u>. The Parties agree that for U.S. federal Tax purposes, Proxima's purchase of all of the stock of Direct from Seller (the "**Purchase Transaction**") shall be treated as a purchase and transfer of the assets of Direct to Proxima, followed by Proxima's transfer of these assets to the capital of Direct in exchange for all of the outstanding stock of Direct, pursuant to Section 1361(b)(3)(C)(ii) of the Code and Treasury Regulation Section 1.1361-5(b)(3), Ex. 9 (the "Agreed Tax Treatment"). The Parties agree to report the Purchase Transaction consistent with the Agreed Tax

10

Treatment, unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code.

(b)   General Cooperation. Proxima, Direct, and the Seller shall cooperate fully (and cause their respective Affiliates, officers, employees, agents, auditors, and other representatives to cooperate fully) as and to the extent reasonably requested by another Party, in connection with Tax matters, including: (A) the preparation and filing of any required Tax Return relating to a Pre-Closing Tax Period (including pursuant to this Section 6.1); and (B) any Tax Proceeding. Such cooperation shall include the retention and (on another Party's request) the provision of records and information that are reasonably relevant to any such Tax matter and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided under this ARTICLE VI; provided, however, that, with respect to any information sought by Proxima as to any direct indemnification claim between any Proxima Indemnified Party and the Seller under this Agreement, the applicable rules of discovery shall apply in lieu of this Section 6.1(b). Proxima shall cause Direct to retain all books and records with respect to Tax matters pertinent to Direct relating to any Pre-Closing Tax Period that are actually transferred to Proxima by the Seller and shall abide by all record retention agreements entered into with any Taxing Authority. The Seller shall (and shall cause its Affiliates, excluding any Representative, to) retain all books and records with respect to Tax matters pertinent to Direct relating to any Pre-Closing Tax Period that are not transferred to Proxima by the Seller but are within the respective possession of the Seller at Closing and shall abide by all record retention agreements entered into with any Taxing Authority. Proxima may transfer, destroy, or discard such books and records at any time on or after the date that is six (6) years following the Closing Date (except as otherwise provided in any record retention agreement entered into with a Taxing Authority); provided, however, that, if the Seller provides Proxima with a written request at least ninety (90) days before the date that is six (6) years following the Closing Date, Proxima shall cause Direct to allow the Seller to take possession of such books and records, rather than destroying or discarding such books and records. To the extent that there is any conflict between any provision in this Section 6.1(b) and Section 6.3, the provisions of this Section 6.1(b) shall prevail.

(c)   Purchase Price Allocation. The Parties agree to allocate (and as applicable, cause their relevant Affiliates to allocate) the Purchase Price and any other items required to be treated as additional consideration for Tax purposes (the "**Allocable Consideration**") among the assets of Direct that, for federal income Tax purposes, are treated as purchased by Proxima pursuant to this Agreement in a manner consistent with Section 1060 of the Code, with such allocation (the "**Allocation Statement**") to be determined by Proxima in accordance with the allocation principles set forth on Exhibit A hereto (the "**Allocation Principles**") and delivered to the Seller within thirty (30) days following the Closing. The Seller will be entitled to provide comments to the Allocation Statement to Proxima within fifteen (15) days following receipt of the Allocation Statement, and Proxima will consider any such comments in good faith, all consistently with the Allocation Principles. Proxima and the Seller shall negotiate in good faith and use their commercially reasonable efforts to resolve any dispute concerning the Allocation Statement. Proxima shall adjust the Allocation Statement to take into account any subsequent adjustment to the Purchase Price in a manner consistent with the procedure and principles set forth in this Section 6.1(c). The Parties shall file or cause to be filed all income Tax Returns (including IRS Form 8594) in a manner consistent with the Allocation Statement as finally determined in accordance with this Section 6.1(c) and shall not make any inconsistent statement or adjustment on any income Tax Return or, during the course of any Tax Proceeding or otherwise, take any Tax position inconsistent with the Allocation Statement, unless so required by a "determination" within the meaning of Section 1313(a) of the Code.

(d)   Disputes. If the Seller and Proxima are unable to resolve a dispute arising under Section 6.1(d), then all issues remaining in dispute and Proxima's responses to such issues will be submitted by Proxima and the Seller for review by an independent accounting firm agreed on by Proxima and the Seller (the "**Independent Accountant**"). The Parties agree to execute, if requested by the Independent

Accountant, a reasonable engagement letter with respect to the determination to be made by the Independent Accountant. Although each Party represents that it is not aware of any conflict as of the date of this Agreement that could adversely impact the Independent Accountant's ability to serve in such capacity, if the designated accounting firm is not eligible (due to a currently existing conflict, a subsequently arising conflict, or otherwise) or will not serve as the Independent Accountant, Proxima and the Seller shall mutually agree on another independent accounting firm of national reputation, and the selected firm shall be the Independent Accountant.

(e)     <u>Inconsistency</u>. If there is any inconsistency between this <u>Section 6.1</u> and any other provision of this Agreement, this <u>Section 6.1</u> shall govern.

**Section 6.2**     <u>Conduct of Business</u>. From the Effective Date to Closing, except as (a) required by Law, (b) requested by Proxima, (c) as pertains to a Seller Loss Determination, and/or (d) as otherwise provided for herein, Direct shall conduct its business in the Ordinary Course and shall not, without Proxima's express written consent:

(i)     sell, issue, repurchase, redeem, or acquire any Equity Interest of Direct;

(ii)     grant options, warrants, calls, phantom units, profit participations, or other rights to purchase or otherwise acquire an Equity Interest in Direct;

(iii)     effect any recapitalization, reclassification, stock split, or like change in the capitalization of Direct;

(iv)     adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization, or other reorganization or merge or consolidate with any other Person or acquire any business or substantial assets of any Person;

(v)     amend the Governing Documents of Direct;

(vi)     change the methods of accounting of Direct, except as required by GAAP or by Law;

(vii)     [reserved];

(viii)     other than in the Ordinary Course, transfer or otherwise dispose of or encumber any property or asset;

(ix)     cancel any debt or waive or compromise any claim or right that is material to Direct, except as required herein;

(x)     make or commit to make any material capital expenditure in excess of $50,000 with respect to the Business of Direct;

(xi)     grant any increase in the compensation of employees, except for increases in the Ordinary Course or as required by any Employee Benefit Plan in effect on the date of this Agreement;

(xii)     other than in any manner consistent with policies and procedures applicable to any Mortgage Loan, change such Mortgage Loan's hedging strategy or practice;

(xiii)    except as may be required by a Taxing Authority, amend or otherwise modify any Tax Return; extend or waive, or cause to be extended or waived, any statute of limitations or other period for the assessment of any Tax or deficiency; make or change any material Tax election or accounting method; or make or initiate any voluntary contact with a Taxing Authority (including any voluntary disclosure agreement or similar process);

(xiv)    sell, assign, transfer, convey, or abandon any material Direct Owned Intellectual Property;

(xv)    incur any Indebtedness which will not be paid in full immediately prior to Closing;

(xvi)    effect any dividend, distribution, sale, issuance, combination, subdivision, or other similar transaction involving Equity Rights of the Seller or the Purchased Interests, other than a dividend or distribution of all cash and cash equivalents to Seller prior to Closing (the "**Pre-Closing Distribution**") provided that all obligations to Direct's employees, contractors and other third parties have been satisfied or an appropriate reserve has been established for reasonably foreseeable expenses to such parties (for the avoidance of doubt, Proxima acknowledges and agrees that the Pre-Closing Distribution is expressly contemplated by this Agreement);

(xvii)    dispose of any existing warehousing facility or terminate any relationship with any secondary market investor; or

(xviii)    agree, whether in writing or otherwise, to take any of the actions prohibited pursuant to the foregoing.

**Section 6.3**    Access; Confidentiality.

(a)    On reasonable notice, Direct shall permit Proxima and its Representatives to have, during the period from the date of this Agreement to the Closing Date, reasonable access to the premises, books, and records of Direct on reasonable advance notice during normal business hours; provided, however, that such access does not interfere with the normal operations of Direct. Direct agrees to furnish Proxima with such financial and operational data and other information with respect to Direct as it may reasonably request.

(b)    If the Closing occurs, for a period of three (3) years from the Closing Date, the Seller shall not (directly or indirectly) disclose, use, or otherwise exploit for their own benefit or for the benefit of anyone other than Proxima any Confidential Information. If the Seller (or one of its Affiliates) is required by Law, or otherwise proposes pursuant to the immediately preceding sentence, to disclose any Confidential Information, the Seller shall, to the extent permitted by applicable Law, notify Proxima in writing promptly so that Proxima may seek an appropriate protective order or waive compliance with the provisions of this Section 6.3(b). The Seller shall (and shall cause its Affiliates to) cooperate with Proxima (at Proxima's cost and expense with respect to any out-of-pocket cost to such Person) to obtain a protective order or other confidential treatment and disclose only that portion of such information as is required by Law. If Closing occurs, for a period of three (3) years from the Closing Date, the Seller shall (and shall cause its Affiliates to) take all reasonable steps to safeguard Confidential Information. The Seller acknowledges and agrees that any and all Confidential Information will be, as of the Closing, the exclusive property of Proxima and agrees to deliver to Proxima any and all tangible or electronic embodiments of Confidential Information in their possession or control as of the Closing in whatever form the same may exist.

**Section 6.4**    Efforts to Consummate.

(a)    Except with respect to a Loss Determination, each of the Parties shall use its commercially reasonable efforts to take (or cause to be taken) all action and promptly to do (or cause to be done) all things necessary, proper, or advisable to consummate and make effective the Transactions as promptly as practicable.

(b)    Except with respect to a Loss Determination, each of the Parties shall: (i) as soon as practicable after the exercise date of the Option: (A) file such applications, notices, registrations, and requests as may be required or advisable to be filed by it with any Governmental Entity or Agency in order to consummate the Transactions; (B) use its commercially reasonable efforts to obtain all consents, authorizations, orders, and approvals of all such Governmental Entities and Agencies referred to in the foregoing clause (A); and (C) use its commercially reasonable efforts to satisfy all conditions, undertakings, and requirements as may be necessary or appropriate to obtain all such consents, authorizations, orders, and approvals or as may be set forth in such consents, authorizations, orders, or approvals; (ii) furnish the other Parties with copies of all documents (except documents or portions of such documents for which confidential treatment has been requested or given) and correspondence: (A) prepared by or on behalf of such Party for submission to any Governmental Entity or Agency; and (B) received by or on behalf of such Party from any Governmental Entity or Agency in connection with the Transactions; and (iii) use its commercially reasonable efforts to consult with and keep the other Parties informed as to the status of such matters. Before any application, notice, registration, or request to any Governmental Entity or Agency is so filed by any Party, such Party must permit the other Parties to review such information and will incorporate any reasonable suggestions of such other Parties provided in good faith with respect to such application, notice, registration, or request to a Governmental Entity or Agency. The Parties agree that Proxima shall, at the Seller's sole cost and expense (which shall include all legal fees, filing fees and other costs and expenses) (collectively, the "**Regulatory Expenses**"), take the lead on the efforts to file for and obtain all such consents, authorizations, orders, and approvals.

(c)    Notwithstanding the foregoing, neither Proxima nor any of its Affiliates shall be required to take any action that would prohibit or limit in any respect or place any conditions on the ownership or operation by Proxima (or any of its Affiliates) or on Direct, or the Business or compel Proxima (or any of its Affiliates) to dispose of, divest, hold separate, or license any portion of Direct, any of its Subsidiaries, the Business, or any of its or their respective businesses or assets, as a result of the transactions contemplated by this Agreement, or to litigate any challenge brought by any Governmental Entity; provided, however, that before abandoning efforts to obtain regulatory approval, Proxima shall first use commercially reasonable efforts to negotiate alternative solutions with the relevant Governmental Entity for a period of at least 30 days.

**Section 6.5**    Qualified Individuals. The Parties shall reasonably cooperate in good faith to ensure that at the time of Closing, Direct shall have in place such employees as necessary to operate the Business in compliance with applicable Law and Agency requirements.

**Section 6.6**    No Shop. Until the Option expires, Direct, the Seller, and their respective Affiliates shall not (and shall not authorize or permit any of their Representatives to), directly or indirectly: (i) knowingly encourage, solicit, initiate, facilitate, or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal, other than to state that Direct, its Affiliates, and each of their Representatives are restricted from entering into, continuing, or participating in such discussions or negotiations pursuant to the terms of this Section 6.6; or (iii) enter into any agreement or other instrument, whether or not binding, regarding an Acquisition Proposal. Direct and its Affiliates shall immediately cease and cause to be terminated (and cause their Representatives to immediately cease and cause to be terminated) all existing

discussions or negotiations with any Person conducted before the date of this Agreement with respect to, or that would reasonably be expected to lead to, an Acquisition Proposal and shall revoke all access in favor of any Person (other than Proxima and its Representatives) to any virtual data room established for the purposes of evaluating a potential acquisition of all or a part of the Business and will promptly request each Person that has before the date of this Agreement executed a confidentiality agreement in connection with such Person's consideration of an acquisition of all or part of the Business return or destroy all confidential information furnished, before the date of this Agreement, to such Person by or on behalf of Direct, its Affiliates, or any of their respective Representatives. For purposes of this Section 6.6, "**Acquisition Proposal**" means any proposal or offer from any Person (other than Proxima or any of its Affiliates) concerning the direct or indirect disposition, whether by sale, merger, or otherwise, of all or any portion of the Business (other than in the ordinary course of the Business), Equity Interests or Equity Rights to any Person other than Proxima. Direct agrees that the rights and remedies for noncompliance with this Section 6.6 shall include having such provision specifically enforced by any court having equity jurisdiction, with its being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Proxima and that money damages would not provide an adequate remedy to Proxima.

Section 6.7    Release. At the Closing, the Seller, on behalf of itself and its successors, assigns, heirs, beneficiaries, equity holders, directors, officers, creditors, representatives, agents and Affiliates, (the "**Seller Releasing Parties**") hereby fully, finally, and irrevocably releases, acquits, and forever discharges Direct, its Affiliates, and their respective successors and assigns and any present and former officers, directors, partners, members, stockholders, trustees, representatives, employees, agents, Affiliates, subsidiaries, predecessors, successors, assigns, beneficiaries, heirs, executors, insurers, and attorneys of any of them (collectively, the "**Direct Released Parties**") from (and hereby unconditionally and irrevocably waives) any and all actions, debts, claims, counterclaims, suits, causes of action, damages, demands, obligations, accounts, and liabilities of any kind or character whatsoever, whether known or unknown, liquidated or contingent, in contract, direct or indirect, at Law or in equity, that such Seller Releasing Party has, had, or may have against the Direct Released Parties or relating to, arising out of, or in any way connected with the dealings of Direct and such Seller Releasing Party, from the beginning of time through the Closing Date, including any claim that relates to or arises, directly or indirectly, out of such Seller Releasing Party's prior relationship with Direct or its rights or status as a shareholder, equity owner, officer, employee, director, or creditor of Direct or any of its Affiliates; provided, however, that such release shall not operate to release any Direct Released Party from: (i) any of the terms, conditions, or other provisions or obligations under this Agreement; (ii) rights under any Employee Benefit Plan maintained, contributed to, or sponsored by Direct as of the Closing; or (iii) any rights to which Seller or its Affiliates may be entitled under any insurance policies of Direct, or (iv) any claim that cannot be released or waived under Law. Each Seller Releasing Party agrees not to institute any Action against any Direct Released Party with respect to any and all claims released pursuant to this Section 6.7. Each Seller Releasing Party hereby represents and warrants that such party has adequate information regarding the terms of this Section 6.7, the scope and effect of the releases set forth in this Section 6.7, and all other matters encompassed by this Section 6.7 to make an informed and knowledgeable decision with regard to entering into this Section 6.7 and the releases set forth in it and that such party has independently (and without reliance on any other party) made its own analysis and voluntary decision to enter into this Section 6.7. Each Seller Releasing Party acknowledges that such party has had the benefit of advice of competent legal counsel with respect to its decision to enter into this Section 6.7, including the release provided for in this Section 6.7.

Section 6.8    Non-Solicitation. For a period of one year following the Closing Date, neither Beech nor the Seller nor any of their respective Affiliates may, directly or indirectly, on its own behalf or on behalf of any other Person, (a) solicit or hire away (or attempt to solicit or hire away) any mortgage loan production-related employee of Direct who was hired by or through the direct efforts of Jason Harris or Brooks Kelly, or (b) solicit (or attempt to solicit) any customer of Direct for the purposes of offering or

providing products or services that are competitive with the Business or for the purpose of inducing any customer of Direct to reduce or discontinue its business with Direct.

Section 6.9    Employee Compensation. Direct (before the Closing) and the Seller (after the Closing) shall be responsible for all transaction bonuses, stay bonuses, change of control, retention, severance, or other similar payments or benefits to be paid or provided to any current or former employee, officer, director, or consultant of Direct (and the employer portion of any Tax related to such payment or benefit) to which any such Person may be entitled directly as a result of the Transaction or pursuant to any agreement or arrangement made by Direct or the Seller prior to the Closing. For the avoidance of doubt, the foregoing shall not apply to compensation paid in the Ordinary Course. The Seller hereby agrees and acknowledges that, although Proxima anticipates retaining all employees of Direct after the Closing, Proxima has no obligation under this Agreement or otherwise to continue to employ any employee of Direct after the Closing; provided, however, that any termination of employees shall be done in compliance with applicable employment laws and regulations.

Section 6.10    [Reserved]

Section 6.11    Use of DirectWare. Proxima shall cause Direct to use the "DirectWare" mortgage software developed by Direct ("**DirectWare**") from the Closing Date to the first anniversary of the Closing Date, at a fee of three hundred dollars ($300) per funded Mortgage Loan, pursuant to the terms and conditions of a licensing agreement to be reasonably and mutually agreed upon by the Parties (the "**DirectWare Licensing Agreement**"). The DirectWare Licensing Agreement will provide that Proxima shall provide the Seller with monthly reports detailing financial and other sales data related to Direct's use of DirectWare. If Proxima is satisfied (as determined within its sole discretion) with DirectWare's features, utility, and price as compared to market alternatives, and the Seller desires to continue licensing DirectWare to Proxima, the Parties intend to enter into a mutually acceptable 5-year license agreement for Direct's continued use of DirectWare after the first anniversary of the Closing Date.

Section 6.12    Financing by Proxima. In the event Proxima decides to fund all or any portion of the Purchase Price through traditional sources of financing, the Seller agrees to cooperate with any reasonable or customary request by Proxima, in connection with such financing, to provide required financial information and other relevant diligence materials related to Direct. Notwithstanding the foregoing, the Closing shall in no way be conditioned upon Proxima's ability to obtain financing.

Section 6.13    Freddie Mac Approval. Proxima hereby acknowledges and agrees that Direct is currently under suspension with Freddie Mac. The Seller shall use commercially reasonable efforts to have such suspension with Freddie Mac lifted and for the Freddie Mac approval to return to good standing prior to the Closing; provided that, notwithstanding anything to the contrary herein, the Closing shall in no way be conditioned upon the Seller successfully obtaining such approval and good standing.

Section 6.14    Transfer of Certain Assets. Prior to Closing, the Seller shall cause Direct to transfer and assign to the Seller or a third party all automobiles owned by Direct as well as all physical assets owned by Direct and used in the operation of the Business.

## ARTICLE VII
## CLOSING CONDITIONS

Section 7.1    Conditions to the Obligations of Each Party. The respective obligations of the Seller and Proxima to consummate the Transactions are subject to the satisfaction or waiver, on or before the Closing Date, of the following conditions:

(a)     No Injunction. There shall be no: (i) injunction, restraining order, or decree of any Governmental Entity of competent jurisdiction in effect that prohibits the consummation of the Transactions; or (ii) Law that prohibits or makes illegal the consummation of the Transactions.

(b)     No Termination. This Agreement has not been terminated in accordance with Section 9.16.

**Section 7.2**     Additional Conditions to the Obligations of Proxima. The obligations of Proxima to consummate the Transactions are subject to the satisfaction or waiver, on or before the Closing Date, of each of the following additional conditions:

(a)     Representations and Warranties. Each of the Seller's representations and warranties shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date.

(b)     Performance of Covenants. The Seller and Direct shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants contained in this Agreement to be performed or complied with by it before or on the Closing Date.

(c)     Deliverables. All the deliverables required by Section 3.3(a) shall have been delivered to Proxima.

(d)     [Reserved].

(e)     Regulatory Authorizations. All Required Regulatory Consents and Filings shall have been obtained or made; provided that, in no event shall the Seller be required to obtain approval from Freddie Mac as a condition to Closing. Proxima, in its sole discretion, may waive the condition set forth in this Section 7.2(e) in return for a mutually agreed upon modification of the Purchase Price.

(f)     No Material Adverse Effect. No Material Adverse Effect shall have occurred since the date of this Agreement.

**Section 7.3**     Additional Conditions to the Obligations of the Seller. The obligations of the Seller to consummate the Transactions are subject to the satisfaction or waiver on or before the Closing Date of each of the following additional conditions:

(a)     Representations and Warranties. Each of the representations and warranties of Proxima shall be true and correct as of the date of this Agreement and as of the Closing Date.

(b)     Performance of Covenants. Proxima shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants contained in this Agreement to be performed or complied with by it before or on the Closing Date.

(c)     Pre-Closing Distribution. Direct shall have effectuated the Pre-Closing Distribution.

(d)     Transfer of Certain Assets. Direct shall have effectuated the transfer of certain assets from Direct to the Seller or a third party as contemplated by Section 6.13.

(e)     Deliverables. All the deliverables required by Section 3.3(b) shall have been delivered to the Seller.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.1**     Survival. The representations and warranties in this Agreement shall survive the Closing and, except as otherwise specifically set forth below, shall terminate and expire twelve (12) months following the Closing Date.

**Section 8.2**     Indemnification by the Seller.

(a)     Subject to the terms of this ARTICLE VIII, the Seller agrees to indemnify, defend, and hold harmless Proxima, Direct, their respective Affiliates, and their respective successors and permitted assigns (the "**Proxima Indemnified Parties**") from and against (and pay and reimburse the Proxima Indemnified Parties for) any and all Losses imposed on, suffered by, or incurred by any Proxima Indemnified Party related to, arising out of, or in connection with:

(i)     any breach or inaccuracy of any representation or warranty of the Seller contained in this Agreement;

(ii)     any nonfulfillment, nonperformance or breach of any covenant or agreement of the Seller contained in this Agreement; or

(iii)     any Taxes: (A) imposed on the Seller for any taxable period; (B) imposed on Direct relating to any Pre-Closing Tax Period; (C) of any Person (other than Direct) that is or has ever been affiliated with Direct or with which Direct otherwise joins or has ever joined (or is or has ever been required to join) in filing any consolidated, combined, unitary, or aggregate Tax Return with respect to any period on or before the Closing Date; (D) of any Person whose Taxes relate to an event or transaction of or by Direct occurring on or before the Closing; (E) required to be paid by Direct after the Closing Date under any Tax sharing, Tax indemnity, Tax allocation, or similar Contract (whether or not written) to which Direct was obligated (or was a party) on or before the Closing Date; or (F) that are Transfer Taxes.

**Section 8.3**     Indemnification by Proxima.

(a)     Subject to the terms of this ARTICLE VIII, Proxima agrees to indemnify, defend, and hold harmless the Seller and its Affiliates, successors and permitted assigns (the "**Seller Indemnified Parties**") from and against (and pay and reimburse the Seller Indemnified Parties for) any and all Losses imposed on, suffered by, or incurred by any Seller Indemnified Party related to, arising out of, or in connection with:

(i)     any breach or inaccuracy of any representation or warranty of Proxima contained in this Agreement;

(ii)     any nonfulfillment, nonperformance or breach of any covenant or agreement of Proxima contained in this Agreement;

(iii)     any matter that occurs on or after the Effective Date and that relates to or results from the services of any person or entity providing services to Direct under any Employment Agreement (a "**Proxima Matter**"); or

(iv)     The operation of the Business on and after the Closing Date.

18

Section 8.4    Certain Limitations. The indemnification provisions provided for in Section 8.2 and Section 8.3 shall be subject to the following limitations:

(a)    Seller shall not be required to indemnify any Proxima Indemnified Party in respect of any Proxima Matter.

(b)    Seller shall not be required to indemnify any Proxima Indemnified Party pursuant to, nor shall Seller have any Liability under, ARTICLE VIII with respect to any Losses until the total of all such Losses exceeds two hundred thousand dollars ($200,000) (the "**Deductible**"), and then only the amounts in excess of the Deductible shall be indemnifiable; provided, however, that the foregoing limitation shall not apply to (A) any claim based on fraud, or (B) any payments by Proxima of EPO or EPD claims using funds from the Loan Loss Reserve as set forth in Section 8.7 below.

(c)    Seller shall not be required to indemnify any Proxima Indemnified Party pursuant to, nor shall Seller have any further Liability under, ARTICLE VIII once the aggregate amount of all payments made by or on behalf of Seller with respect to Seller's indemnification obligations under ARTICLE VIII equals two hundred thousand dollars ($200,000) (the "**General Representations Cap**"); provided, however, that the foregoing limitation shall not apply to (A) any claim of actual fraud, or (B) any payments by Proxima of EPO or EPD claims using funds from the Loan Loss Reserve as set forth in Section 8.7.

(d)    Without limiting the General Representations Cap, Seller shall not be required to indemnify any Proxima Indemnified Party pursuant to, and shall not have any further Liability under, this ARTICLE VIII once the aggregate amount of all payments made by or on behalf of Seller with respect to the indemnification obligations under this ARTICLE VIII, including any payments by Proxima of EPO or EPD claims using funds from the Loan Loss Reserve as set forth in Section 8.7, equals the Purchase Price.

(e)    For the purposes of computing the amount of any Loss incurred by a Seller Indemnified Party or Proxima Indemnified Party, there shall be deducted an amount equal to the amount of any insurance proceeds, indemnification payments, contribution payments, or reimbursements actually received and collected (net of the costs of collection), by such Indemnified Party or any of its Affiliates in connection with such Loss or any of the circumstances giving rise thereto; provided that if an insurance or other recovery is made by such Indemnified Party or any of its Affiliates with respect to any Loss for which any such Person has been indemnified hereunder, then a refund equal to the aggregate amount of the recovery shall be made promptly to the Indemnifying Party.

(f)    Each of the Parties hereto agrees to take all reasonable steps to mitigate their respective Losses upon and after becoming aware of any event or condition that could reasonably be expected to give rise to any Losses that are indemnifiable hereunder.

(g)    Notwithstanding anything to the contrary in this Agreement, it is intended that the provisions of this Agreement will not result in any duplicative payment of any amount required to be paid under this Agreement. EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE IV OF THIS AGREEMENT, THE PURCHASED INTERESTS AND ANY ASSETS OF DIRECT ARE BEING SOLD, TRANSFERRED, AND CONVEYED ON AN "AS IS, WHERE IS" BASIS AND THE SELLER MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.

**Section 8.5**      Indemnification Procedures.  The party making a claim under this ARTICLE VIII is referred to as the "**Indemnified Party**," and the party against whom such claims are asserted under this ARTICLE VIII is referred to as the "**Indemnifying Party**."

(a)      Third-Party Claims. If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third-Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) calendar days after receipt of such notice of such Third-Party Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party is actually prejudiced thereby. Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third-Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense. In the event that the Indemnifying Party assumes the defense of any Third-Party Claim, subject to Section 8.5(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party, provided, that if in the reasonable opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third-Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third-Party Claim, the Indemnified Party may, subject to Section 8.5(b), pay, compromise, defend such Third-Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third-Party Claim. The Indemnifying Party may assume the defense of a Third-Party Claim; provided, however, that, before assuming control of such defense, the Indemnifying Party must acknowledge that it has an indemnity obligation for any Loss resulting from such Third-Party Claim. The Seller and Proxima shall cooperate with each other in all reasonable respects in connection with the defense of any Third-Party Claim, including making available records relating to such Third-Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third-Party Claim.

(b)      Settlement of Third-Party Claims. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party, except as provided in this Section 8.5(b). If a firm offer is made to settle a Third-Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third-Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such

firm offer within ten (10) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense pursuant to Section 8.5(a), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(c)     The Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed).

(d)     Direct Claims. Any claim by an Indemnified Party on account of a Loss that does not result from a Third-Party Claim (a "**Non-Third-Party Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice of such claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except (and only) to the extent that the Indemnifying Party shall have been actually and materially prejudiced or forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Non-Third-Party Claim in reasonable detail. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Non-Third-Party Claim. During such thirty (30) day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Non-Third-Party Claim and whether and to what extent any amount is payable with respect to the Non-Third-Party Claim, and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to Direct's premises and personnel and the right to examine and copy any account, document, or record) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not respond within such thirty (30) day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement. Notwithstanding anything to the contrary in this Agreement, if after the Closing Date, Direct receives a demand for repurchase of a Mortgage Loan, indemnification, or similar relief, Proxima shall ensure that Direct gives the Seller notice of such demand promptly after receipt of such demand, allow the Seller reasonable access to any related information requested by the Seller, and permit the Seller to attempt to refute such demand and negotiate a reasonable settlement of such demand. The Seller shall pay such settlement amounts to Proxima no later than three (3) Business Days before the final repurchase or make-whole date.

Section 8.6     Treatment of Indemnity Payments.  To the maximum extent permitted by Law, it is the intention of the Parties to treat any indemnity payment made under this Agreement as an adjustment to the Purchase Price for all purposes (including Tax purposes), and the Parties agree to file (or cause to be filed) their Tax Returns consistently with such characterization.

Section 8.7     Loan Loss Reserve. Without limiting the Seller's obligations to indemnify Proxima:

(a)     At Closing, the Seller shall deposit one hundred fifty thousand dollars ($150,000) into a cash reserve (the "**Loan Loss Reserve**"), which Loan Loss Reserve shall be used by Proxima and

Direct exclusively for the payment of early payoff ("**EPO**") claims and early payment default ("**EPD**") claims that are imposed on Direct during the twelve months immediately following the Closing Date.

        (b)      One hundred eighty (180) days after the Closing Date, Proxima shall release from the Loan Loss Reserve and pay to the Seller an amount equal to seventy-five thousand dollars ($75,000) less all amounts used by Proxima and Direct to pay post-closing EPO and EPD claims.

        (c)      On the first anniversary of the Closing Date, Proxima shall release from the Loan Loss Reserve and pay to the Seller all remaining amounts in the Loan Loss Reserve.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1**    <u>Notices</u>. All notices, consents, waivers, and other communications under this Agreement must be in writing and shall be deemed to have been duly given: (a) when delivered by hand (with written confirmation of receipt); (b) when transmitted (except if transmitted on a day that is not a Business Day, then as of the next Business Day) via facsimile or email with confirmation of transmission; (c) the day following the day (except if not a Business Day, then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service; or (d) the third Business Day following the day on which the same is sent by registered or certified mail (postage prepaid, return receipt requested), in each case, to the appropriate addresses set forth below (or to such other addresses as a Party may designate by notice to the other Parties):

      <u>If to Proxima, to</u>:

      Proxima Holdings, LLC
      12130 Quail Creek Dr.
      Houston, TX 77070
      Attention: Jason Harris and Brooks Kelly
      Email: jason@proximafunds.com
            brooks@proximafunds.com

      <u>with a copy (which will not constitute notice) to</u>:

      Weiner Brodsky Kider PC
      1300 19th Street NW, 5th Floor
      Washington DC  20036
      Attention: Don J. Halpern
      Email: halpern@thewbkfirm.com

      <u>If to the Seller, to</u>:

      5 Eaglewood Lane
      Sandy, UT 84092
      Attention: James Beech
      Email: jim@beech1.com

      <u>with a copy (which will not constitute notice) to</u>:

      Bennett Tueller Johnson & Deere, LLC
      3165 East Millrock Drive, Suite 500

Salt Lake City, UT 84121
Attention: Brent J. Hawkins
Email: bhawkins@btjd.com

**Section 9.2**    <u>Expenses</u>. Except as otherwise set forth in this Agreement, whether or not the Transactions are consummated, each Party will pay its own respective expenses in connection with the negotiation and the consummation of this Agreement.

**Section 9.3**    <u>Severability</u>. The provisions of this Agreement are severable, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions in this Agreement. If any provision of this Agreement – or the application of such provision to any Person or any circumstance – is found to be invalid or unenforceable in any jurisdiction, a suitable and equitable provision must be substituted for such provision to carry out that provision to the extent that it may be valid or enforceable. The remainder of this Agreement and the application to other Persons or circumstances of the provision that is deemed invalid or unenforceable will not be affected by such invalidity or unenforceability. Nor will such invalidity or unenforceability affect the validity or enforceability of such provision – or the application of such provision – in any other jurisdiction.

**Section 9.4**    <u>Counterparts</u>. This Agreement may be executed and delivered (including by facsimile, .pdf, or similar electronic transmission) by the Parties in separate counterparts, each of which when executed will be deemed to be an original, but all of which taken together will constitute one and the same agreement.

**Section 9.5**    <u>Entire Agreement</u>.  This Agreement (including any Exhibits to this Agreement) constitutes the entire agreement and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter of this Agreement and such prior agreements and understandings.

**Section 9.6**    <u>No Third-Party Beneficiaries</u>.  Nothing in this Agreement, express or implied, is intended to (or shall) confer on any other Person any legal or equitable benefit, claim, cause of action, remedy, or right of any kind, except as set forth in <u>ARTICLE VIII</u>, in which case the provisions of <u>ARTICLE VIII</u> shall inure to the benefit of the Persons expressly referred to in <u>ARTICLE VIII</u> who are intended to be third-party beneficiaries of such benefit, claim, cause of action, remedy, or right, and none of such provisions may be amended, modified, or waived in a manner adverse to such applicable third-party beneficiary without the consent of such third-party beneficiary.

**Section 9.7**    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to rules governing the conflict of laws.

**Section 9.8**    <u>Consent to Jurisdiction</u>.

(a)    Each of the Parties hereby irrevocably and unconditionally consents to submit to the sole and exclusive jurisdiction of the District Courts of the State of Texas; <u>provided</u>, <u>however</u>, that, if, and only after, such courts determine that they lack subject-matter jurisdiction over any such legal action, suit, or proceeding, such legal action, suit, or proceeding shall be brought in the United States District Court for the Northern District of Texas (in such order, the "**<u>Chosen Courts</u>**"), for any litigation arising out of or relating to this Agreement or the negotiation, validity, or performance of this Agreement or the Transactions. Each of the Parties hereby agrees not to commence any litigation relating to this Agreement or the negotiation, validity, or performance of this Agreement or the Transactions, except in the Chosen Courts, waives any objection to the laying of venue of any such litigation in the Chosen Courts, and agrees

23

not to plead or claim in any Chosen Court that such litigation brought in such court has been brought in an inconvenient forum.

(b)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT, OR OTHERWISE), DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NEGOTIATION, VALIDITY, OR PERFORMANCE OF THIS AGREEMENT OR THE TRANSACTIONS. EACH OF THE PARTIES HEREBY ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9.8(b)</u>.

Section 9.9    <u>Publicity</u>. None of the Parties nor their respective Affiliates or Representatives shall issue, or cause the publication of, any press release or other public announcement or communication with respect to the Transactions without the prior written consent of Beech and Proxima, which consent shall not be unreasonably withheld, except to the minimum extent necessary to comply with the requirements of any Law based on the advice of counsel, in which case the Party required to make the release or statement or communication shall allow the other Parties reasonable time to comment on such release, statement, or communication in advance of such issuance, disclosure, or filing and shall make changes to such release, statement, or communication as the other Parties may reasonably request. Each Party agrees that the terms of this Agreement shall not be disclosed or otherwise made public and the copies of this Agreement shall not be publicly filed or otherwise made available to the public, except when such disclosure, availability, or filing is required by any Law, in which case such disclosure or making public shall be done only to the extent required by such Law. If such disclosure, availability, or filing is required by any Law, then to the extent that "confidential treatment" would be available, each of the Parties agrees to use its reasonable commercial efforts to obtain "confidential treatment" of this Agreement and to redact such terms of this Agreement as the other Parties may request. Notwithstanding the foregoing: (a) Proxima may make disclosures to any lender or potential lender to Proxima or its Affiliates (including Direct); and (b) the Parties may make disclosures to their Representatives in connection with their compliance with this Agreement, tax, or legal reporting requirements or as necessary to assist such Party in exercising its rights or satisfying and performing its covenants and obligations under this Agreement; <u>provided</u>, <u>however</u>, that the provisions of this <u>Section 9.9</u> shall apply to such Representatives and the Party disclosing such information to its Representatives shall notify them of the provisions of this <u>Section 9.9</u> and shall be responsible for any breach of the provisions of this Agreement by them. For avoidance of doubt, nothing in this <u>Section 9.9</u> limits any Person's ability to provide such information to – or have discussions with – any Agency, Governmental Entity, or Consent Party for the purposes of fulfilling a Party's obligations under this Agreement.

Section 9.10    <u>Assignment</u>. No Party to this Agreement may assign any of its rights or obligations under this Agreement without the prior written consent of all the other Parties, which shall not be unreasonably withheld; <u>provided</u>, <u>however</u>, that nothing in the foregoing shall prohibit Proxima from making any assignment to any of its: (i) Affiliates so long as such Affiliate agrees in writing to be bound by all of the terms, conditions, and provisions contained in this Agreement; and (ii) successors to all or substantially all of the business and assets of Proxima, whether in a merger, consolidation, sale of substantially all assets, or other similar transaction. Any purported assignment, hypothecation, or transfer in breach of this <u>Section 9.10</u> shall be null and void, ab initio. This Agreement shall be binding on, inure to the benefit of, and be enforceable by the Parties, their successors, permitted assigns. For the avoidance of doubt, a change in tax status (e.g., S Corporation or C Corporation) or corporate form (e.g., limited liability company or corporation) shall not be considered an assignment under this <u>Section 9.10</u>. If a permitted assignment of this Agreement pursuant to this <u>Section 9.10</u> occurs, such assignee shall agree in writing to

be bound by all of the terms, conditions, and provisions contained in this Agreement and no such assignment shall release Direct from its obligations under this Agreement.

Section 9.11    Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption of burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.12    Amendment; Waiver.  This Agreement may not be amended, except by an instrument in writing signed on behalf of each of the Parties hereto. Except with respect to any provision contained in this Agreement that provides for a specific time period to exercise a right, power, or privilege, the failure or delay of any Party to assert any of its rights under this Agreement shall not constitute a waiver of any of such rights. No single or partial exercise of any right, power, or remedy under this Agreement shall preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy under this Agreement. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition or a waiver of any other term or condition of this Agreement. No notice to – or demand on – one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

Section 9.13    Further Assurances. Each Party will cooperate with the other, execute and deliver to the other Parties such other instruments and documents, and take such other actions as may be reasonably requested by any other Party (and at the cost and expense of the requesting Party) as necessary to carry out, evidence, and confirm the intended purposes of this Agreement.

Section 9.14    Specific Performance. Each Party acknowledges and agrees that the other Parties may be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement by the Parties may not be adequately compensated in all cases by monetary damages alone. Accordingly, in addition to any other right or remedy to which any Party may be entitled under this Agreement, at law or in equity, each Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance or temporary, preliminary, or permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

Section 9.15    No Recourse. This Agreement may be enforced only against – and any Action based on, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement may be brought only against – the Parties, and such enforcement or Action may relate only to the specific obligations set forth in this Agreement with respect to such Party. No past, present, or future Affiliate, director, officer, employee, incorporator, manager, member, partner, stockholder, agent, attorney, or other Representative of any Party or of any Affiliate of any Party shall have any Liability for any obligations or Liabilities of any Party under this Agreement or for any Action based on, with respect to, or by reason of the Transactions contemplated by this Agreement.

Section 9.16    Termination.

(a)    This Agreement may be terminated and the Transactions abandoned at any time before the Closing Date (such date of termination, the "**Termination Date**"):

(i)    by the mutual written consent of the Seller, Beech, and Proxima;

(ii)     by the Seller or Proxima, by written notice to the other, if: (A) there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited; or (B) any Governmental Entity shall have issued an Order restraining or enjoining the Transaction and such Order shall have become final and non-appealable;

(iii)     by Proxima, if either GNMA or Fannie Mae does not approve or consent to this Transaction;

(iv)     by Proxima, by written notice to the Seller, if any of the conditions set forth in Section 7.2 shall not have been fulfilled by four (4) months from the exercise date of the Option (the "**End Date**"), unless such failure shall be due to the failure of Proxima to perform or comply with any of the covenants, agreements, or conditions of this Agreement to be performed or complied with by Proxima before the Closing, which End Date may once be extended by up to two months at the election of Proxima if the Required Regulatory Consents and Filings are the cause of a delay in Closing and the Seller continues to fulfill their obligations set forth in Section 6.4(b).

(v)     by Proxima, by written notice to the Seller, if Proxima is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in, or failure to perform any representation, warranty, covenant, or agreement made by the Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy, or failure cannot be cured by the Seller by the End Date; or

(vi)     by the Seller, in event that the Seller determines, in the Seller's sole and absolute discretion, that, after the Effective Date, the Business is losing money and the Seller determines to wind up and dissolve the Business (a "**Loss Determination**");

(vii)     by the Seller, in the event of the termination of any of the Employment Agreements;

(viii)     by the Seller, by written notice to Proxima, if the Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in, or failure to perform any representation, warranty, covenant, or agreement made by Proxima pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy, or failure cannot be cured by Proxima by the End Date; and

(b)     In the event of termination of this Agreement pursuant to this Section 9.16, written notice of such termination shall forthwith be given by the terminating Party to the other Party or Parties, this Agreement shall become null and void and of no further force and effect, and all further obligations of the Parties under this Agreement will terminate without further action by any of the Parties; provided, however, that: no such termination shall release any Party from liability from any Loss arising out of any intentional breach of this Agreement by such Party that occurs on or before the termination of this Agreement.

(c)     Notwithstanding the foregoing or anything to the contrary herein, in the event that Proxima shall not have exercised the Option prior to first anniversary of the Effective Date, this Agreement shall automatically terminate and become null and void and of no further force and effect, and all further obligations of the Parties under this Agreement will terminate without further action by any of the Parties; provided, however, that: (i) this ARTICLE IX (other than Section 9.14) shall survive the termination of this Agreement; and (ii) no such termination shall release any Party from liability from any Loss arising out of any intentional breach of this Agreement by such Party that occurs on or before the termination of this Agreement.

**Section 9.17**    <u>Acknowledgment Regarding Legal Counsel</u>.

(a)    Each of the Parties acknowledges that Bennett Tueller Johnson & Deere, LLC ("***BTJD***"), legal counsel for the Seller, was involved in the preparation of this Agreement, but is not representing Proxima in any capacity, directly or indirectly, in connection with this Agreement or the Transactions. Proxima represents that Proxima has had the opportunity to consult with independent counsel concerning this Agreement and the Transactions and has either done so or voluntarily chosen to not so do.

(b)    All communications between the Seller or Direct, on the one hand, and BTJD, on the other hand, relating to the negotiation, preparation, execution and delivery of this Agreement and the consummation of the Transactions (the "**<u>Privileged Communications</u>**") shall be deemed to be attorney-client privileged and the expectation of client confidence relating thereto shall belong solely to Seller and shall not pass to or be claimed by Proxima or Direct following the Closing. Accordingly, Proxima and Direct shall not have access to any Privileged Communications or to the files of BTJD relating to such engagement from and after the Closing and may not use or rely on any Privileged Communications in any claim, dispute, action, suit or proceeding against or involving Seller.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** each of the undersigned has executed and delivered this Option to Purchase Agreement as of the date first written above.

**Proxima Holdings, LLC**

By: _____
AD92E10F75A547D...
Jason Harris, Member

By: _____
51DBA182AD114DD...
Brooks Kelly, Member

**Beech Enterprises, L.L.C.**

By: _____
12F83B7BE8FA45C...
James Beech, Manager

[*Signature Page to Option to Purchase Agreement*]

**EXHIBIT A**

**ALLOCATION PRINCIPALS**

The Allocable Consideration will be allocated among the assets of Direct as follows (class references will conform to Section 1060 of the Internal Revenue Code and Treasury Regulations Sections 1.1060-1).The Allocable Consideration will be allocated first to the Class I assets, if any, up to the value of such assets as set forth below. Any excess Allocable Consideration will next be allocated to Class II assets, if any, up to the value of such assets as set forth below. For purposes of clarity, after the Allocable Consideration is allocated to each class up to the value thereof as determined below, any excess Allocable Consideration will be allocated to the next sequential class of assets. Any Allocable Consideration remaining after the allocations to assets in Classes I through VI shall be allocated to Class VII assets. The listing of a class of assets in the table below does not necessarily mean that such class of assets is applicable to the Transactions.

| Asset Class | Allocation Methodology |
| --- | --- |
| Class I (cash, demand deposits, etc.) | The face amount of any Class I assets included within the assets of Direct as of the Closing Date. |
| Class II (marketable stock, government securities, etc.) | The fair market value of the Class II assets, if any, included within the assets of Direct as of the Closing Date. |
| Class III (accounts receivables, mortgages, etc.) | An amount equal to 85% of the net book value of the Class III Assets, if any, as of the Closing Date. |
| Class IV (inventory, etc.) | An amount equal to the net book value of the Class IV Assets, if any, as of the Closing Date. |
| Class V (assets other than Class I, II, III, IV, VI or VII assets) | An amount equal to the net book value of the Class V Assets, if any, as of the Closing Date. |
| Class VI (Section 197 intangibles, other than goodwill and going concern value) | Zero. |
| Class VII (goodwill and going concern value) | The remainder of the Allocable Consideration. |

  

# EXHIBIT 4

 **Direct Mortgage Corp**
Offer Of Employment

Congratulations! It is our pleasure to extend to you an offer to join our team. We are incredibly impressed with your accomplishments and believe you have what it takes to be the best of the best.

Your career with Direct Mortgage will be rewarding. We understand the value of promoting from within. This philosophy is evident in the career tracks of our Managers and Executives. As a part of the Direct Mortgage family, you can build a career centered on strong values and a high-performance culture. We want you to succeed and we are eager to invest in your future.

Please review your offer details below. Feel free to contact us with any questions regarding the details of this offer.

- Title: Strategic Advisor
- Manager: Jim Beech
- Office Address: Remote
- Start Date:

Details:
- Company agrees to take and document all steps necessary to prohibit Associate from any access to Georgia consumer NPI
- Within 120 days of onboarding the first additional incremental retail branch, all parties will take necessary steps to notify regulators that The Company intends to add Associate as a control person and surrender any licenses necessary, including but not limited to Georgia.
- Upon regulatory approval, Associate position will be EVP Strategy
- Bonus compensation will be defined as 25% of the delta between operating profit earnings before depreciation and amortization, prior to and after employment commences. Any negative number prior to employment is assigned to a value of zero.

Upon acceptance of this offer, you will receive your new hire paperwork. An HR Onboarding Specialist will sit with you to provide personalized support through your transition. Please note that this employment offer is contingent on your satisfactory completion of all onboarding documents and agreements as well as completing and passing all reference, background, education, and employment verification.

By signing below, you are certifying that you have not entered into any agreements with your previous employer that would in any way restrict the activities required to perform your job with Direct Mortgage. In addition, please note that if you possess any confidential or proprietary information regarding your previous employer, we insist that you do not disclose or use such information in connection with your Direct Mortgage employment.  Specifically, that means you should not take customer lists from your prior employer or any information on loans closed by your prior employer. Additionally, you should not take any information from customers that was stored in your prior employer's systems or sent to you or any at your prior employer.  Additionally, loans in process at your prior employer should stay there and you should take any and all actions needed to assist your employer in closing those loans as needed.  Please



# Direct Mortgage Corp
## Offer Of Employment

understand that this offer is contingent upon compliance with these expectations and if violated, we reserve the right to withdraw this offer of employment and/or terminate your employment as applicable.

Should you choose to accept this offer, please understand your employment is at-will, meaning that you have the right to end your employment with us at any time, for any reason or no reason, with or without cause or advance notice – and, of course, Direct Mortgage has that same right.

We look forward to having you join the Direct Mortgage team, and we'll be behind you each step of the way. Please sign below and return this document. Please contact me if you have any questions.

Congratulations and welcome to the Direct Mortgage family.

**Direct Mortgage Corp**

Name: Jim Beech

Title: CEO

Signature: *James Beech*

Date: 05/08/2025

Associate Name: Jason D. Harris

Signature: _____

Date: 05/07/2025